979 A.2d 792 (2009)
410 N.J. Super. 43
STATE of New Jersey, Plaintiff-Respondent,
v.
David COOPER, Defendant-Appellant.
DOCKET NO. A-2810-07T4
Superior Court of New Jersey, Appellate Division.
Remanded by Supreme Court February 7, 2008.
Argued December 3, 2008.
Decided September 3, 2009.
*795 Claudia Van Wyk, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Jean D. Barrett, Designated Counsel, Montclair, of counsel and on the brief; Ms. Van Wyk, Lawrence S. Lustberg, Newark, and Jonathan L. Hafetz, Designated Counsel, on the briefs).
Elaine A. Leschot, Assistant Prosecutor, argued the cause for respondent (Luis A. Valentin, Monmouth County Prosecutor, attorney; Nancy A. Hulett, Kathleen S. Bycsek, and Patricia B. Quelch, Assistant Prosecutors, of counsel; Ms. Hulett and Ms. Bycsek, on the briefs).
Appellant filed a pro se supplemental brief.
Before Judges STERN, PAYNE and WAUGH.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted at a jury trial on all counts of an indictment charging him with purposeful or knowing murder by his own conduct, contrary to N.J.S.A. 2C:11-3(a)(1) or (2) (count one); felony murder, contrary to N.J.S.A. 2C:11-3(a)(3) (count two); kidnapping, contrary to N.J.S.A. 2C:13-1(b) (count three); and two counts of aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a)(1) and (3) (counts four and five). The offenses occurred on July 18, 1993, when the victim, L.G., was six years old. State v. Cooper, 151 N.J. 326, 341-42, 700 A.2d 306 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000). On May 17, 1995, defendant was sentenced to death for the capital murder. The felony murder conviction was merged therein.[1] The trial judge also imposed a consecutive term of fifty-years imprisonment with twenty-five years of parole ineligibility on the kidnapping conviction, and a consecutive term of twenty years with ten years of parole ineligibility on the two aggravated sexual assault convictions, which were merged into each other. Id. at 341, 347, 405-06, 700 A.2d 306.
On defendant's direct appeal, the Supreme Court affirmed the murder conviction and capital sentence. Id. at 341, 406-07, 700 A.2d 306. The Court also held that the aggravated sexual assault convictions should have been merged into the kidnapping conviction and vacated the aggravated sexual assault convictions. The kidnapping conviction and sentence were affirmed. Id. at 405-06, 700 A.2d 306. On the subsequent proportionality review, the Court also upheld the death penalty. *796 State v. Cooper, 159 N.J. 55, 116, 731 A.2d 1000 (1999).
Defendant thereafter filed a verified petition for post-conviction relief (PCR) and amended petitions. Following initial rulings on discovery by the PCR judge, the Supreme Court granted leave to appeal and summarily reversed "those provisions in the trial court orders requiring defendant to produce for the State trial counsel's entire file ... without prejudice to the State making a subsequent motion to the trial court for discovery of the file, which request shall be narrowly tailored to include only relevant and non-privileged information." State v. Cooper, 175 N.J. 70, 812 A.2d 1104 (2002).
The trial court conducted an evidentiary hearing on the issue of whether defendant was deprived of his right of allocution in the penalty phase, and on October 16, 2003, dismissed that aspect of the petition. By order dated October 24, 2003, the judge dismissed the balance of the petition without an evidentiary hearing.
Defendant appealed as of right to the Supreme Court. R. 2:2-1(a)(3). By order dated April 20, 2005, the Supreme Court determined that "a more expansive record is required for the fair resolution of several of the issues raised by defendant's ineffective assistance of counsel claim." Accordingly, while otherwise retaining jurisdiction, the Court remanded the matter to the Law Division "for a plenary hearing to explore fully the following issues":
(1) Whether trial counsel were ineffective because they failed to call Dr. Adams or a substitute expert as a witness at trial to support defendant's contention that the victim's death was accidental and not intentional;
(2) Whether trial counsel were ineffective because they failed to introduce evidence of defendant's intoxication as a defense at trial;
(3) Whether trial counsel were ineffective because they failed to introduce evidence of defendant's mental disease or defect as a defense at trial; and
(4) Whether, in respect of 1, 2, and 3 above, trial counsel had sufficient time to investigate and prepare for trial after the removal of Diane Aifer, Esquire, as counsel for defendant; [and]
(5) Whether additional psychological testing and access to defendant's prison records were necessary for the prosecution of defendant's post-conviction relief petition in light of the earlier August 2001 order (i) requiring production of defendant's prison records from the archives of the New Jersey State Prison and (ii) compelling prison officials to allow entry of Dr. Atkins into the prison for the purposes of evaluating defendant and obtaining prison records in connection with that evaluation[.]
On remand, additional evidentiary hearings were held between February 8 and September 14, 2006. At the conclusion of the hearings, on March 19, 2007, the PCR judge again denied the petition.
On December 16, 2007, the Governor commuted defendant's sentence to life imprisonment without the possibility of parole. Executive Order, Commutation of Death Sentences to Life Imprisonment Without Parole (Dec. 16, 2007), and on December 17, 2007, the Legislature abolished the death penalty. L. 2007, c. 204. As a result, by order dated February 7, 2008, the Supreme Court "remanded" the case to us based upon the commutation of defendant's death sentence and the abolition of the death penalty. State v. Cooper, 194 N.J. 258, 944 A.2d 22 (2008). We now affirm the denial of PCR.

*797 I.
We first reject the suggestion that this appeal is moot by virtue of the Governor's commutation of defendant's sentence to life without parole and the Legislature's abolition of the death penalty and substitution of a sentence of life without parole.[2]
In State v. Fortin, 198 N.J. 619, 969 A.2d 1133 (2009), the Supreme Court held that a defendant who had been found guilty of capital murder committed before the death penalty was abolished, but who had not been sentenced at the time the death penalty was abolished, could only receive the statutorily substituted sentence of life without parole if he were tried at a penalty proceeding and the jury found that an aggravating factor or factors existed and outweighed any mitigating factors. Id. at 631-33, 969 A.2d 1133. If aggravating factor(s) were not found to exist or to outweigh the mitigating factors, the defendant could only receive the maximum non-capital sentence available at the time of the offense, here thirty years to life imprisonment with thirty years to be served before parole eligibility. Id. at 631, 969 A.2d 1133. See also N.J.S.A. 2C:11-3b.
As a result, if defendant's conviction were to be set aside in the PCR proceedings, he would be entitled to a new trial and, if found guilty of capital murder, he would be in the same position as Fortin, subject to life without parole only after another penalty phase hearing in which the aggravating factor or factors were found to exist and to outweigh the mitigating. And if defendant were found to have ineffective assistance of counsel at the penalty phase only, or the sentence were otherwise set aside, he would be entitled to a new penalty phase hearing because the result could still impact the sentence. Under Fortin, life without parole, as opposed to a sentence with a thirty-year period of parole ineligibility, can only follow a penalty proceeding at which the aggravating factors were found to outweigh the mitigating. 198 N.J. at 633, 969 A.2d 1133. Otherwise, ex post facto principles would preclude imposition of a sentence of life without parole.

II.
The evidence presented at the guilt phase of defendant's trial is detailed in the Supreme Court's opinion on defendant's direct appeal:[3]
On July 18, 1993, the six-year-old victim, L.G., her mother, R.G., and the *798 victim's two sisters were at the home of R.G.'s sister-in-law, M.W., in Asbury Park. While M.W. was at the supermarket, R.G. sat on the front porch of the house with her youngest daughter. The victim and her other sister were with M.W.'s daughter playing in the frontyard. After playing in the frontyard for some time, the children moved into a fenced-in backyard.
While they were playing in the backyard, defendant lured the victim away from the other children and eventually picked her up, lifted her over the fence, and walked away with her. The other children went to the frontyard and told R.G. what had occurred. R.G., joined by M.W., who had just returned from the supermarket, began to search for and to call out to L.G., but they could not locate her. Soon after, neighbors joined in the search.
The Asbury Park Police Department was contacted shortly after L.G.'s disappearance, and police officers also joined the search. Within a few hours after the victim had disappeared, her body was found under a porch of an abandoned house. Defendant lived under that porch. L.G. was found lying on her back on a mattress with her shirt pulled up, her panties at her ankles, a pair of men's boxer shorts over her face, and her vaginal area exposed and bloodstained.
The police found clothing and a bloodstained paper towel at arms's length from L.G.'s body. The police also found a gym bag that contained a wallet. Inside the wallet was defendant's social-security card. Defendant's latent fingerprints were found on a paper bag and on a malt-liquor bottle in the porch area. Several letters, photographs, and other documents in defendant's name were also found in the area.
That night, the police interviewed witnesses to the abduction, and defendant became a suspect almost immediately. Defendant was located the next day and was taken to police headquarters for questioning. The State concedes that defendant was in custody at that time. He was read his Miranda[[4]] rights, and he signed a form waiving his rights to remain silent and to counsel. At that time, defendant denied any involvement in the child's death.
Soon thereafter, Detective John Musiello confronted defendant with the evidence that the police had against him and told him that they would seek a court order to obtain forensic evidence from his person. No law-enforcement officer, however, informed defendant that he was facing a potential death sentence. Instead, they told him that the perpetrator was facing a term of life imprisonment with thirty years of parole ineligibility.
Defendant then confessed to causing L.G.'s death. According to slightly varying police testimony, he dropped his head and stated either: (1) "It was an accident. I did it. I was drunk;" or (2) "It's an accident. I was drunk. I strangled her." Defendant explained that he had seen children playing at M.W.'s house on his way to the porch of the abandoned house and that he had told L.G. to come to him. He lifted her over the fence and led her underneath the porch of the abandoned house. Defendant then stated, "Then we had sex, and I strangled her" and that he had left her body underneath the porch. After further questioning, defendant admitted that he had ejaculated and that he had *799 worn a condom which he later had discarded in a nearby field.
Defendant subsequently signed a formal written statement, in which he described the sexual penetration of L.G. as vaginal and stated that she had bled from her vagina during the penetration, causing blood to get on defendant's clothes. He also told the police that he had been on top of L.G. during the penetration and that his hands had been on her neck.
An autopsy of L.G.'s body revealed dried blood on the skin of her lower abdomen and external genitalia. Numerous internal injuries were found in her vaginal canal and cervix. Her hymen was not intact. Her anal canal also showed signs of injury. The autopsy revealed swelling in L.G.'s trachea and lungs, petechial hemorrhages on the outer surface of the thymus, and swelling in her brain.
The medical examiner concluded that the injuries on and around L.G.'s neck, the edema in her lungs, and the swelling in her brain were consistent with asphyxia caused by manual strangulation. He also concluded that pressure probably had been applied for approximately four to six minutes because, for edema to form in the lungs, pressure would have had to have been applied for three to six minutes, and for irreversible brain damage to occur from lack of oxygen, pressure would have had to have been applied for four to six minutes.
The police obtained seven discarded condoms from a field, close to the abandoned house, to which defendant had led them, and obtained from defendant samples of his hair, saliva, and blood. None of the condoms tested positive for semen, although one had blood on it. Blood was found on the paper towel discovered under the porch, on the cushion on which L.G. had been found, on two pairs of sneakers found under the porch, and on defendant's jeans, t-shirt, and boxer shorts. No semen was found on L.G.'s clothes or person. Four pubic hairs found on L.G. were consistent with defendant's pubic hair, although they could not be linked to him conclusively.
[Cooper, supra, 151 N.J. at 342-44, 700 A.2d 306.]
In the same opinion, Justice Coleman detailed the facts relating to the penalty phase of defendant's trial.
The defense presented an enormous amount of mitigating evidence about defendant's tragic childhood, which was replete with numerous foster care placements, abuse, neglect, and exposure to violence, drugs, and alcohol. Several experts testified that the lack of stability in defendant's life, his exposure to violence, and his lack of a relationship with his mother had affected him in numerous ways, such as making him aggressive and unable to empathize with others, as well as by reducing his ability to understand cause and effect. The defense also presented expert testimony that, as a result of defendant's upbringing, he was extremely emotionally disturbed and that he had not developed normally.
The State's strategy during the penalty phase was to emphasize the good aspects of defendant's childhood. The prosecutor thus elicited testimony from defendant's relatives about the positive aspects of his familial and foster-care relationships, which the prosecutor argued in summation.
The State rebutted defendant's expert mitigating evidence by presenting testimony that defendant's personality disorder was not treatable. The State's expert also testified that defendant's childhood would not prevent him from *800 knowing the difference between right and wrong and would not make him unable to control his actions.
The jury unanimously found that the State had proven that defendant had committed the murder to escape detection, N.J.S.A. 2C:11-3c(4)(f), and that he had done so in the course of committing aggravated sexual assault and kidnapping, N.J.S.A. 2C:11-3c(4)(g). The jury, however, unanimously found that the State had failed to prove the existence of the c(4)(c) aggravating factor, namely, that the murder had involved depravity, N.J.S.A. 2C:11-3c(4)(c). Some or all of the jurors found the following mitigating factors: (1) that defendant had been denied nurturing as an infant (6 jurors); (2) that he had been born to drug and alcohol-dependent parents (12 jurors); (3) that drinking by his mother during pregnancy had contributed to defendant's physical and developmental disabilities (2 jurors); (4) that his father had abused members of the family when defendant was an infant, thereby exposing him to violent and abusive behavior (8 jurors); (5) that his mother had abandoned him with relatives throughout his youth (3 jurors); (6) that his mother had neglected and abused him because of her own upbringing and dependence on alcohol (10 jurors); (7) that throughout his childhood, he had been exposed to excessive amounts of domestic violence and substance abuse (10 jurors); (8) that he had suffered through multiple placements and periodically had attended 11 different schools (10 jurors); (9) that he had been denied consistent treatment throughout childhood despite identification of emotional and psychological problems (3 jurors); (10) that his background had increased significantly his risk of engaging in substance abuse and antisocial behavior (8 jurors); (11) that he had been allowed to abuse drugs and alcohol at an early age (6 jurors); (12) that he had begun acting out during his childhood because of unresolved and untreated emotional disturbances (6 jurors); (13) that during his childhood, he had been exposed periodically to an unstable father (6 jurors); (14) that he had been deprived of a stable nurturing home throughout his childhood (5 jurors); (15) that he had not been provided with recommended and necessary therapy (4 jurors); and (16) that the sudden death of his mother had left him with unresolved grief issues that were not addressed through therapy (6 jurors). The jury unanimously rejected the following two factors: (1) that defendant had been denied exposure to proper role models during his childhood; and (2) the "any other reasons not mentioned" factor.
However, the jury unanimously found that the two aggravating factors together outweighed the mitigating factors beyond a reasonable doubt. Defendant was accordingly sentenced to death.
[Cooper, supra, 151 N.J. at 345-47, 700 A.2d 306.]
See also Cooper, supra, 159 N.J. at 64-68, 731 A.2d 1000 (summarizing the guilt and penalty phase proceedings).
We shall discuss the evidence presented at the PCR hearing incident to our discussion of the issues raised before us.

III.
Defendant claims that he was denied the effective assistance of counsel at both the guilt and penalty phases of his trial. Claims of ineffective assistance of counsel are usually considered on petitions for PCR "because such claims [often] involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 459-60, 609 A.2d 1280 (1992). See also R. 3:22-4. Hearings are required *801 on ineffective assistance of counsel claims where there is a factual dispute on matters that are not part of the record, and where "a defendant has presented a prima facie claim in support of post-conviction relief." Preciose, supra, 129 N.J. at 461-62, 609 A.2d 1280. "To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate a reasonable likelihood of succeeding under the test set forth in Strickland v. Washington," 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted in New Jersey in State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987). See also State v. Goodwin, 173 N.J. 583, 596, 803 A.2d 102 (2002). On the other hand,
[A] post-conviction relief applicant is [not] entitled to a plenary hearing in every case in which an issue of fact is asserted. A trial court judge, of course, after considering the papers submitted in support of and in opposition to the application, has the discretion to evaluate an issue as lacking adequate factual or legal merit.
[State v. Pyatt, 316 N.J.Super. 46, 51, 719 A.2d 674 (App.Div.1998), certif. denied, 158 N.J. 72, 726 A.2d 936 (1999).]
See also State v. Cummings, 321 N.J.Super. 154, 728 A.2d 307 (App.Div.), certif. denied, 162 N.J. 199, 743 A.2d 852 (1999).
Here, defendant argued in his initial Supreme Court PCR brief and reply brief that the PCR judge erred by denying him an evidentiary hearing on most of his ineffective assistance of counsel claims. That argument was addressed by the Supreme Court in its order dated April 20, 2005, in which it summarily remanded for a hearing on the five issues quoted above, ruling that "a more expansive record [was] required for the fair resolution" of those issues. Our review of the record also convinces us that an evidentiary hearing was conducted on the issues that warranted it. Preciose, supra, 129 N.J. at 462, 609 A.2d 1280; see also Feldman v. Lederle Labs., 125 N.J. 117, 132-33, 592 A.2d 1176 (1991) (order of the Supreme Court binding as to the scope of issues for consideration on remand if it intended to preclude others by its disposition).
There is no dispute that defendant had a constitutional right to the effective assistance of trial counsel, during both the guilt and penalty phases, and to effective assistance of appellate counsel. Evitts v. Lucey, 469 U.S. 387, 395-96, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 830 (1985); United States v. Cronic, 466 U.S. 648, 653-55, 104 S.Ct. 2039, 2043-44, 80 L.Ed.2d 657, 664-65 (1984); State v. Marshall, 148 N.J. 89, 250, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997); State v. Davis, 116 N.J. 341, 356, 561 A.2d 1082 (1989); State v. Sugar, 84 N.J. 1, 15-17, 417 A.2d 474 (1980). However, in evaluating a claim of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential," Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, and we must give substantial deference to the trial judge's findings of fact on the issue if they are supported by the record. State v. Harris, 181 N.J. 391, 415-16, 859 A.2d 364 (2004), cert. denied, 545 U.S. 1145, 125 S.Ct. 2973, 162 L.Ed.2d 898 (2005).
Decisions as to trial strategy or tactics are virtually unassailable on ineffective assistance of counsel grounds:
[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigation or to *802 make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
[Strickland, supra, 466 U.S. at 690-91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.]
Accord State v. DiFrisco, 174 N.J. 195, 220-21, 804 A.2d 507 (2002); State v. Martini, 160 N.J. 248, 266, 734 A.2d 257 (1999); Marshall, supra, 148 N.J. at 157, 690 A.2d 1. "Merely because a trial strategy fails does not mean that counsel was ineffective." State v. Bey, 161 N.J. 233, 251, 736 A.2d 469 (1999), cert. denied, 530 U.S. 1245, 120 S.Ct. 2693, 147 L.Ed.2d 964 (2000).
It is well known that to establish a claim of ineffective assistance of counsel, defendant must prove two elements. First, defendant must prove that, with respect to some specified issue, counsel's performance was deficient in that it "fell below an objective standard of reasonableness." Strickland, supra, 466 U.S. at 687-888, 690, 104 S.Ct. at 2064, 2066, 80 L.Ed.2d at 693, 695. Second, he must prove prejudice, defined as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Accord State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987). See also Preciose, supra, 129 N.J. at 463-64, 609 A.2d 1280; State v. Allen, 398 N.J.Super. 247, 253-54, 941 A.2d 634 (App.Div.2008).
Before abolition of the death penalty, L. 2007, c. 204, the Strickland/Fritz standard applied to capital trials, albeit "with some adjustment." State v. Chew, 179 N.J. 186, 204, 844 A.2d 487 (2004). As to both phases of capital trials, the first element of the Strickland/Fritz analysis, deficiency of counsel's performance, was adjusted to account for the expectation that capital counsel would have expertise in the unique issues presented in capital cases. Ibid. (citing Davis, supra, 116 N.J. at 356-57, 561 A.2d 1082). The second prong of the Strickland/Fritz analysis, prejudice, was not altered for the guilt phase, while "a less demanding prejudice-prong standard" was applied to the penalty phase. Ibid. To prove ineffective assistance of counsel in the penalty phase of a capital trial resulting in death, a defendant was required to establish both that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." Marshall, supra, 148 N.J. at 250, 690 A.2d 1. Accord Harris, supra, 181 N.J. at 432, 859 A.2d 364; Bey, supra, 161 N.J. at 251-52, 736 A.2d 469. This "equates with `a probability sufficient to undermine confidence in the outcome.'" Marshall, supra, 148 N.J. at 250, 690 A.2d 1 (quoting Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698).
The reason for applying the "less demanding" prejudice-prong standard to the penalty phase was "the unique function and responsibility" of a capital jury, which had broad discretion "in deciding between life and death," as well as "the realistic limitations on appellate review of jury penalty-phase deliberations." Marshall, supra, 148 N.J. at 248-51, 690 A.2d 1. In other words, a less stringent standard was applied because "death is different." Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 883 (1976).
Because of the principles applicable when this case was tried and the fact that defendant is now serving life imprisonment *803 without parole as a result of the verdict which resulted in the imposition of capital punishment, we continue to apply those standards in this case. Based on those standards, we find that the record supports the conclusions of Judge Ira Kreizman in denying PCR.

IV.
We explore the issues warranting discussion in a written opinion and summarily reject any others. R. 2:11-3(e)(2). We first address issues in common to both phases of the trial, and thereafter those unique, or more related, to the guilt phase and penalty phase respectively. We start, however, with a description of the evidentiary basis for the claims as developed at the PCR hearing.
In addition to specific claims of ineffective assistance, defendant asserts that he was denied the effective assistance of counsel because of the removal of Diane Aifer as his trial counsel shortly before the trial began.[5] Aifer was the head of the Monmouth Regional office of the Public Defender's Office when defendant was arrested in July 1993. Aifer assigned herself to work on defendant's case together with David Donnelly and staff investigators. Donnelly was admitted to practice in 1966, and he had been employed in the Public Defender's office since 1982.
Aifer and Donnelly divided the work on the various aspects of defendant's case. Donnelly was essentially to handle the guilt phase, and Aifer was principally responsible for developing the evidence, including expert evidence, to be presented during the penalty phase. However, some of the expert evidence she developed was also relevant to the guilt phase. For example, evidence to contradict expected testimony of the medical examiner regarding the intentional nature of the victim's death was relevant to both phases. In the guilt phase, Aifer also was responsible for addressing the DNA evidence, and she was expected to cross-examine the medical examiner.
Before defendant's case, Aifer had tried "several dozen" noncapital criminal cases, and she had worked on three other capital cases. She had also consulted on another capital case that was resolved as a noncapital case, and she had received training on the handling of capital cases. Donnelly was also an experienced criminal defense attorney and had prior experience on one capital case in which he had worked with Aifer.
Jury selection began on January 30, 1995. By that time, Aifer had been gathering evidence for use in the penalty phase and developing theories for the presentation of mitigating evidence. She had obtained a social history report and several psychological evaluations of defendant prepared by experts. However, her work was not complete, particularly with respect to development of the issue of fetal alcohol syndrome (FAS), a subject to be discussed at length hereinafter. She planned to continue working on her investigation through jury selection, and she believed she would have sufficient time to complete her work because she did not believe that the trial, "or the penalty phase certainly," would begin until "two to three months" after jury selection had begun.
On February 9, 1995, Aifer resigned from the Public Defender's Office as a result of a dispute with her supervisors in Trenton. She believed that the Public Defender "had absolutely no confidence in [her] ability to handle the capital case." At the time Aifer resigned, jury selection was ongoing. She continued with jury selection *804 in the days after February 9, pending resolution of motions related to her removal as an attorney for defendant.
The Public Defender moved to relieve Aifer as counsel, and for a stay of trial for ninety days, which the State opposed. On February 14, 1995, the trial court denied both motions. The Public Defender then moved before this court for leave to appeal and for a stay of jury selection and trial. According to Donnelly, the goal was "to buy as much time" as possible for Aifer's replacement to familiarize himself with the case. The defense asked for ninety days, but Donnelly "was hoping" to get between forty-five and sixty. We granted leave to appeal and relieved Aifer as defendant's counsel. However, we declined to stay jury selection. Rather, we stayed the commencement of the guilt phase for thirty days following conclusion of the jury selection process and before the jury was sworn, "to allow defense counsel adequate time to prepare for the guilt and penalty phases of the trial."
The State then filed a motion with the Supreme Court for leave to appeal, to challenge the removal of Aifer as defendant's counsel and the resulting stay of the trial. Defendant, through the Public Defender, opposed the motion and the Supreme Court denied it.
John McMahon was assigned as Aifer's replacement, with the division of responsibilities between Donnelly and McMahon as they had been between Donnelly and Aifer. McMahon was to work on the penalty phase of the trial. He was relieved of responsibility for his other caseload. In addition, Steven Kirsch was assigned to work on any appellate legal issues that arose. Both McMahon and Kirsch are known to us as exceptional attorneys who practice full-time with the Public Defender.
McMahon was admitted to practice in 1989 and began working in the Public Defender's Office in 1990. Prior to defendant's case, he had worked on only one capital case that actually went to trial. His role in that case had been to prepare the guilt phase.
McMahon began working on defendant's case immediately after his assignment in February 1995. He spoke with Aifer and, with the assistance of a volunteer intern, organized Aifer's files and became familiar with them. He also met defendant, worked with the assigned investigators, requested additional resources, and contacted both expert and fact witnesses. McMahon was present on all days of jury selection after his assignment, between February 21 and March 21, 1995.
After jury selection, pursuant to our order, there was a thirty-day adjournment of the proceedings to permit defense counsel to prepare for trial. During that period, McMahon worked with the "mitigation specialist," prepared "mitigation materials," and worked to "get the witnesses lined up." He met with the defense experts Aifer had retained, and he retained additional experts as well. He also participated to some degree in Donnelly's preparation of the guilt phase witnesses. In particular, he worked with Donnelly to retain Dr. John Adams, whom the defense planned to call as a guilt phase witness regarding the cause of the victim's death. McMahon expected that Adams's testimony would also be relevant in the penalty phase.
On April 24, 1995, at the end of the thirty-day period, the guilt phase commenced. McMahon believed he was present at all guilt phase proceedings. Donnelly could not recall if McMahon had been present on all days. McMahon cross-examined one witness during the *805 guilt phase, and continued to gather evidence for use during the penalty phase.
The guilt phase was completed after six trial days, on May 2, 1995, and the penalty phase began six days later, on May 8 three months after McMahon was assigned to the case. He had devoted his time exclusively to the case following his assignment.
During the penalty phase, defense counsel made a strategic decision to limit the presentation of mitigating evidence to the time before defendant's eighteenth birthday, in order to focus on defendant's experiences as a child. The record reflects that defendant had a terrible childhood, which included parents and caregivers who were addicted to alcohol and other drugs, and who were physically, sexually, and verbally abusive. He did not have a stable home life; he constantly was moved between family members and foster care placements in New Jersey, Florida, and Pennsylvania. Defendant's alcoholic mother died when he was about nine years old, and his alcoholic and violent father was in and out of prison. He also suffered from physical disabilities relating to his premature birth. At an early age, he developed psychological, emotional, and behavioral problems, became addicted to alcohol and drugs, and got into trouble with the law. State v. Cooper, supra, 151 N.J. at 345, 700 A.2d 306 and Cooper, supra, 159 N.J. at 66-68, 731 A.2d 1000.
Defendant's legal expert on PCR, Carl Herman, is an attorney experienced in capital litigation. Herman believed that defense counsel's performance was adequate in the guilt phase, but ineffective in the penalty phase of the trial. He believed that defense counsel did not have sufficient time to prepare for the penalty phase, particularly to obtain the necessary experts on fetal alcohol syndrome and mental disease or defect. In addition, he believed that counsel erred by limiting the penalty phase evidence to events before defendant's eighteenth birthday, by not addressing the mitigating factor of intoxication, and by not calling a physician to challenge the medical examiner's testimony about the length of time the victim suffered.
According to Herman, the penalty phase was the most significant phase of defendant's trial because "frankly ... they were going to lose" the guilt phase. The evidence of defendant's guilt was "[v]ery powerful... including his own confession." Thus, "there was no way they were going to win the guilt phase of the case. Mr. Cooper was going to be convicted no matter what Mr. Donnelly did...."
The sole defense presented during the guilt phase of trial was that defendant had accidentally, and not purposefully or knowingly, killed the victim. As the Supreme Court noted on defendant's direct appeal:
At trial, the defense conceded defendant's guilt of felony murder, kidnapping, and aggravated sexual assault. The defense contested, however, that the murder was purposeful or knowing. Instead, defendant contended that the killing had occurred accidentally during the course of an aggravated sexual assault. Thus, he claimed that there had been no intent to strangle the child but rather that death had been caused by unintentionally placing pressure on her carotid artery for about thirty seconds.
[Cooper, supra, 151 N.J. at 342, 700 A.2d 306.]
The basis for this defense was the contents of defendant's confession, in which he maintained that the victim's death was an accident. Id. at 343, 700 A.2d 306. Defense counsel also acknowledged the testimony of the medical examiner, Dr. Jay Peacock, that pressure had been applied to the victim's neck for only between four to *806 six minutes, id. at 344, 700 A.2d 306, but attempted to show through cross-examination of the medical examiner that death could have occurred even more rapidly than that.
Although defense counsel retained an expert, Dr. John Adams, to testify regarding the victim's very rapid death, they ultimately chose not to present his testimony, notwithstanding their inability to sway the medical examiner on his four-to-six minute timeline. Aifer, Donnelly, and McMahon explained this decision at the PCR hearings.
Donnelly testified that one of his goals during the guilt phase of the trial was to establish that the victim's death may have occurred very quickly, and thus been accidental, as defendant had stated in his confession. To develop that theory, defense counsel extensively interviewed the medical examiner, Peacock, and they contacted a pathologist, Dr. Michael Baden, to investigate the cause of the victim's death.
Baden concluded that the victim most likely lost consciousness after two or three minutes, and, most probably, she was unconscious during the sexual assault. Baden further stated that one could not conclude from the forensic evidence that the victim's death was an intentional and knowing act, or that defendant had acted knowingly or intentionally to cause the victim severe suffering. Defense counsel viewed Baden as a potential witness in both the guilt and penalty phases.
However, defense counsel ultimately chose not to use Baden, because he was "awful to deal with." "You just can't get a hold of [him]" and "can't get anything from him." Instead, they retained Adams. McMahon had worked with Adams in the past, as had another deputy public defender that McMahon knew. Adams was willing to testify, consistent with his report dated April 5, 1995,[6] that: (1) it would have taken only a "small" amount of force for an adult male to kill the six-year-old victim; and (2) the victim's death was caused in significant part by constriction of the carotid arteries, as opposed to airway obstruction, and death under those circumstances would have occurred "very rapidly."
Defense counsel did not call Adams as a witness, however, because they discovered during trial that he did not have significant experience investigating deaths by strangulation, and "he was in trouble in another State for something." Consequently, they feared that calling him could completely destroy their accidental death theory. There was no time to find a replacement for Adams, and counsel did not request additional time from the trial judge because "[i]t didn't seem practical."
At the PCR hearings, it was developed that Peacock had testified at trial that the victim, while still alive, had grabbed her anal area in response to "noxious stimuli," causing fecal matter to be transferred to her hand. This testimony related to the issue of how long the child had been alive and suffering, and thus the intentional nature of her deatha guilt phase issue. It also related to the depravity of the crime an aggravating factor relevant to the penalty phase proceedings. See N.J.S.A. 2C:11-3(c)(4)(c) (amended Dec. 17, 2007, L. 2007, c. 204). We note, however, that the jury did not find the aggravating factor of depravity. Cooper, supra, 151 N.J. at 382, 700 A.2d 306.
*807 At trial, defense counsel did not call an expert to contest Peacock's testimony regarding the fecal matter. Instead, they relied upon their cross-examination of Peacock. In Donnelly's opinion, it would have been "too ugly" to call an additional witness on the issue and risk exposing the jury to additional crime scene photographs.
On PCR, defense counsel took issue with trial counsel's decisions not to call an expert witness to counter Peacock's testimony (1) on the amount of time it took the victim to die, and (2) the significance of the fecal matter. On these issues, they called Dr. Daniel Spitz, an expert in forensic pathology, who had issued a report dated October 3, 2005.
Spitz stated that the victim was alive during the sexual assault, although he thought it "very likely that she was unconscious." He further stated that the victim had died of manual strangulation and the resultant vascular compromise of her carotid arteries, as opposed to the obstruction of her airway. Typically in the case of vascular-compromise strangulation, unconsciousness occurs within ten-to-twelve seconds, and death occurs within "the range of four minutes" of continuous obstruction. Moreover, in this case, given the young age of the victim, only a small amount of force would have been needed for a fatal vascular strangulation.
Spitz further stated that fecal matter in the victim's hand could have been transferred when her body was moved by the police or emergency service personnel, before she was examined by Dr. Peacock. It did not necessarily transfer as a result of the victim's own actions, and therefore it did not indicate that the victim had responded to pain by grabbing her anus.
In rebuttal, the State presented Steve Padula, a Lieutenant in the Monmouth County Prosecutor's Office.[7] Padula testified that the fecal matter found in the victim's hand had been there when he first observed her body under the porch, before her body had been transported, but after it had been placed on a sheet by the first aid personnel. Given the placement of the fecal matter inside the victim's curled hand, Padula did not think it could have been transferred when her body was placed on the sheet.
As we have noted, in his testimony, defendant's legal expert, Herman, opined that the guilt phase verdict was not adversely affected by counsel's failure to call an expert witness on the issue of accidental death. A guilty verdict was virtually assured because defendant had confessed to the crime, and the evidence of his guilt was very strong. In Herman's words:
I can't say that the guilt phase performance was deficient. I can't imagine even if they presented the testimony of Dr. Spitz or Dr. Adams that it probably would have made a big difference in the jury's minds. It's possible. But I'm not relying on that. And I wouldn't say I don't think the guilt, the outcome of the guilt phase would have been different had they presented this type of testimony. I think it would be helpful and there would have been some carryover in the penalty phase, but I don't have any fault with them, particularly in the guilt phase.
Defense counsel did not present an intoxication defense in the guilt phase. Nor did they pursue defendant's intoxication at the time of the crime as a mitigating factor in the penalty phase. See N.J.S.A. 2C:11-3(c)(5)(d) (repealed Dec. 17, 2007, L. 2007, c. 204). At the PCR hearings, Donnelly *808 and Aifer testified that, immediately upon their assignment to the case, they investigated all aspects of defendant's life. Among the issues they investigated were defendant's intoxication at the time of the crime, and his history of alcoholism and drug dependency. Ultimately, based upon the expert evidence they developed, Donnelly, Aifer, and McMahon all concluded that an intoxication defense was unsupportable.
At counsel's request, psychologist Dr. Frederick Rotgers evaluated defendant before trial and issued a report dated July 7, 1994. There was no scientific evidence establishing defendant's level of intoxication at the time of the crime. Therefore, Rotgers was forced to rely upon anecdotal evidence. Rotgers concluded "within a reasonable degree of professional certainty," that defendant's blood alcohol level at the time of the offense would have rendered him "legally intoxicated." However, according to Aifer, Rotgers also concluded that defendant's faculties were "probably not" impaired by his level of intoxication "because of his extensive abuse of alcohol from a very, very early age." Therefore, defendant's intoxication was "not sufficient... to diminish or eliminate his capacity to form the requisite mental states of culpability for the offenses with which he is charged." See State v. Cameron, 104 N.J. 42, 53-54, 514 A.2d 1302 (1986).
Rotgers further concluded that, based upon defendant's ability to provide a "clear, unqualified and lucid account" of his interrogation, it was "unlikely" that defendant was significantly impaired at the time of his arrest and his statement to police. Therefore, his level of intoxication did not prevent him from "understand[ing] or knowing[ly] and voluntarily waiv[ing] his Miranda rights prior to giving his statement to the police investigators."
Rotgers' conclusions were consistent with the PCR testimony of John Musiello, John Dyott, and Valerie Hussein, detectives employed or formerly employed by the Monmouth County Prosecutor's Office. These witnesses stated that, at the time of his arrest and interrogation, defendant did not smell of alcohol, did not appear to be under the influence of alcohol or any other drug, and was able to give a clear and consistent description of his activities on the date of the crime.
At the PCR hearings, defense counsel did not present any testimony or argument that took issue with trial counsel's failure to pursue an intoxication defense in the guilt phase. Rather, they pursued an argument that trial counsel had erred by not pursuing intoxication as a mitigating factor in the penalty phase. In this regard, they presented the testimony of Dr. Robert Pandina, "an expert in developmental neuropsychology and psychopharmacology with an expertise in the effects of alcohol on human physiology and human behavior." Pandina agreed with Rotgers that defendant's blood alcohol level at the time of the offense would have been approximately.17 percent. At that level of intoxication, defendant would have been impaired, but not significantly so, and his past alcohol abuse would have prevented him from feeling his impairment. Therefore, Pandina agreed with Rotgers that defendant's intoxication would not have diminished his culpability for his crimes. However, he believed it would have been relevant to mitigation during the penalty phase in conjunction with "potential functional deficits resulting from fetal alcohol exposure," an issue to which we now turn.
In their investigation of defendant's life circumstances in advance of trial, counsel considered whether defendant's culpability for his crimes should be diminished, or whether his punishment should be mitigated, *809 as a result of fetal alcohol syndrome or some other mental disease or defect. In pursuit of such claims, Aifer arranged for defendant to be evaluated by multiple psychological and psychiatric experts, including Rotgers, who had analyzed the intoxication defense, and Drs. Jonathan Willard-Mack and Robert Sadoff.
Rotgers evaluated defendant and issued reports dated December 2, 1994 and April 21, 1995. He also issued an updated report in 2001 with respect to the petition for PCR. In his 1995 report, Rotgers concluded that defendant suffered from "impaired frontal lobe functioning," which resulted in difficulty engaging in higher order executive functioning, including cognitive flexibility and adjusting one's behavior to changing external circumstances. He suggested that, given defendant's history, he may have "suffered, either prenatally as a result of fetal alcohol exposure or as a result of his heart condition, subtle cerebral damage that has reduced brain functioning...."
Rotgers advised defense counsel to consider fetal alcohol effects as a possible diagnosis. However, he could not testify to that issue because it was beyond his area of expertise. He opined that defendant's cognitive deficits were consistent with antisocial personality disorder with borderline traits, albeit with some possible relationship between that diagnosis and fetal alcohol exposure. He stated:
It seems likely that some of the behavior that forms the basis of the Axis-II [Antisocial Personality Disorder with Borderline Traits] diagnosis is due to neurological dysfunction resulting from prolonged substance use, early cerebral anoxia, and possible fetal alcohol effects. Thus, this may be more correctly categorized as a Personality Change Due to a General Medical Condition. That would clearly be the diagnosis if a structural neurological basis for the cognitive deficits documented by neuropsychological screening is found.
In the December 1994 report, Dr. Rotgers recommended "[a] SPECT [Single Photon Emission Computed Tomography] or other sophisticated brain imaging assessment [be conducted] to clarify any structural deficits...."
Dr. Willard-Mack evaluated defendant and issued a report dated January 10, 1995. He concluded that defendant was "an extremely psychologically disturbed individual," suffering from numerous psychiatric disorders including substance abuse and dependence, a personality disorder, and depression, which made him "prone to poorly controlled and poorly modulated violent, angry and impulsive behavior." He also believed that defendant suffered from "a mild, diffuse, static encephalopathy" and suggested "the possibility of brain damage due to fetal exposure to alcohol." Like Rotgers, he suggested that a brain scan might be helpful in assessing defendant's condition.
Upon these recommendations, Aifer made efforts to obtain a PET scan of defendant's brain. Ultimately, however, only a SPECT was performed. The SPECT was performed in April 1995, after McMahon's assignment to the case, and it demonstrated "very small, subtle focal areas" of decreased brain activity of uncertain etiology. "Correlation with a CT and/or a MRI" was recommended. McMahon did not pursue a PET scan, nor did he pursue an MRI or a CT scan, although he could not recall why. He stated that it may have been a tactical decision, or it may simply have been a function of lack of time.
Willard-Mack stated that the SPECT confirmed "the presence of a cognitive disorder, not otherwise specified, secondary to chronic, developmental brain injury." *810 He believed that this was an issue to be taken into consideration as a mitigating factor weighing against a death sentence.
In a revised report, dated January 24, 2002, and prepared in the context of the PCR hearings, Willard-Mack diagnosed defendant as suffering from a cognitive disorder. In his 2002 opinion, he also went much further than he had in his pretrial report, concluding that defendant's mental disorder related not only to the mitigating factors but also to his guilt or innocence of the crimes. In this regard, Willard-Mack concluded:
In addition to mitigating factors, the neurological diseases of the brain, in combination with intoxication at the time of the crime in question, raise the issue that [defendant] may well have met the criteria for diminished capacity for the murder in question due to not fully knowing the nature of his criminal acts due to the combined effects of brain damage and drug and alcohol intoxication.
In his earlier 1995 report, Willard-Mack had not issued any such diagnosis or conclusion.
Finally, Dr. Robert Sadoff, a psychiatrist, also evaluated defendant, and issued a report to the defense on January 23, 1995. Sadoff noted Willard-Mack's finding that defendant suffered from "a mild encephalopathy." Nevertheless, Sadoff concluded that there was "[i]nsufficient evidence to support a diagnosis of fetal alcohol syndrome," although he believed that "clearly" defendant was "affected by" his mother's drinking "and the unstable life that he was exposed to."
In Sadoff's opinion, defendant's psychological problems and his intoxication at the time of the offense were relevant to the mitigating factors and thus the penalty phase of defendant's trial. However, they did not affect defendant's "capacity to conform his conduct to the requirements of the law ... sufficient to constitute a defense to prosecution," and thus they were not relevant to the guilt phase of his trial.
Ultimately, based upon these experts' conclusions on the issue of mental disease or defect, Aifer determined that there was no viable diminished capacity defense to defendants' crimes. However, at the time she was relieved from the case, Aifer intended to continue pursuing the issue of fetal alcohol syndrome because, although the experts were unable to diagnose the syndrome, they all agreed that defendant had been affected by his mother's alcohol abuse.
Picking up on Aifer's work, McMahon pursued the issue of fetal alcohol syndrome for purposes of mitigation. However, the experts he contacted either could not work with him in the limited time frame available, or they could not support a fetal alcohol syndrome diagnosis. In the end, defense counsel did not present any evidence regarding defendant's brain damage or neurological deficits caused by fetal alcohol syndrome or otherwise, believing they had achieved enough through their cross-examination of Dr. Michals.[8]
At the PCR hearings, defendant took issue with trial counsel's failure to adequately pursue the issue of fetal alcohol syndrome. He called numerous witnesses who testified to the likelihood that defendant suffered from the syndrome, and to the fact that trial counsel had erred in not calling witnesses on the subject. We shall develop the evidence presented at the PCR hearing in the relevant portion of the opinion.

*811 V.

A.
Defendant argues that the Public Defender denied him effective assistance of counsel by removing Aifer as his attorney in the midst of jury selection, without his knowledge or consent, and substituting McMahon without demanding an adjournment of sufficient length to prepare adequately for the penalty phase of the case, particularly because, at the time of Aifer's removal, her investigations and preparations were incomplete.
According to defendant, as a result of McMahon's relative inexperience at the time, he pursued an uninformed mitigation strategy which focused exclusively on defendant's life up to the age of eighteen, and this strategy precluded consideration of the statutory mitigating factor of defendant's intoxication at the time of his offense. Defendant further contends that McMahon had insufficient time to develop significant areas of mitigation evidence, including defendant's fetal alcohol syndrome and brain damage, and the sexual abuse he suffered as a child. According to defendant, McMahon should have requested a continuance when he became aware of how much work still needed to be done in advance of the penalty phase.[9]
Judge Kreizman found that defendant was not denied effective assistance of counsel as a result of Aifer's removal from the case. He found that "counsel had sufficient time to explore intoxication as a defense, and whether the death was accidental or non-intentional." He concluded that additional time would not have resulted in any credible expert willing to testify in defendant's favor on either of those subjects, and defense counsel's failure to call their available witnesses on these subjects did not affect the outcome of the case. In this regard, Judge Kreizman noted the amount of effort and resources Aifer and Donnelly had put into the case before Aifer resigned, stating:
It must be understood that this was not a capital murder case where a defense team was ordered to trial quickly and without sufficient time to adequately prepare. Monmouth County Public Defenders' office geared up early for this trial. The attorneys were assigned almost immediately upon defendant's arrest. Ms. Aifer and Mr. Donnelly embarked on a plan to create an effective defense, realizing at an early date that this would be a case where it was almost a certainty that the penalty phase would be reached. They spared no expense in hiring experts, collecting all of defendant's biographical and medical information, located and interviewed relatives and friends of defendant. They used their investigators, their Appellate Division counsel and all of their resources of the office.
They agreed on a strategy as to how to proceed in both the guilt and penalty phases. They even used the focus group to try out their trial philosophy and tactics. They really left no stone unturned. *812 Defendant was interviewed, consulted throughout.
Finally, the judge concluded that defendant was not prejudiced by counsel's not having developed and presented evidence on fetal alcohol syndrome or mental disease or defect in either phase of the trial because an expert on that issue would not have affected the result. As we will hereinafter develop at length with respect to defendant's petition for PCR concerning the penalty phase, although there was substantial evidence at the PCR hearing that defendant suffered from fetal alcohol syndrome, Judge Kreizman concluded that there were "no demonstrable physical irregularities in Mr. Cooper's brain" resulting from the syndrome. Finally, Judge Kreizman noted that, even without evidence of fetal alcohol syndrome in particular, the jury had been presented with a great deal of information regarding defendant's life, including the tragic effects of his pre- and post-natal exposure to alcohol. However, that evidence had not swayed the jury to a non-death sentence.
We reject the suggestion that Aifer's removal from the case warrants reversal of either the conviction or penalty phase disposition. We are satisfied that the replacement of Ms. Aifer did not result in the deprivation of the effective assistance of counsel. First, as to the guilt phase, there is no dispute that it was going to be handled principally by Mr. Donnelly, and Mr. Donnelly testified that he asked for more time than needed to replace Ms. Aifer. He was given thirty days after jury selection was concluded before the trial was commenced. Ms. Aifer was focusing on death penalty issues designed to spare defendant's life. Even defendant's expert, Carl Herman, could not find a basis for supporting defendant's claim of ineffective assistance at the guilt phase.
We add only that the Public Defender represented defendant and, in the absence of prejudice, had the right to substitute counsel before the jury was sworn and empanelled. See, e.g., United States v. Gonzalez-Lopez, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409, 416 (2006) (discussing "right of a defendant who does not require appointed counsel to choose who will represent him."); State ex rel. S.G., 175 N.J. 132, 141, 814 A.2d 612 (2003). In any event, the real issue in determining whether defendant was deprived of the effective assistance of counsel must relate to the assistance he actually received. As to that, we find that Mr. McMahon, like Mr. Donnelly, cannot be faulted for his defense of a matter that involved the sexual assault and death of a six-year-old.

V. B.VII
[At the court's request portions of the opinion relating to the guilt phase or to both the guilt and penalty phases of the trial are omitted from publication.]

VIII.
Defendant argues that he received ineffective assistance of counsel in the penalty phase because counsel pursued an uninformed and ill-advised mitigation strategy. As we have noted, defendant claims counsel erred by focusing exclusively on his life up to the age of eighteen, which was harmful because it precluded consideration of his intoxication and mental disease and defect at the time of his offense. On the other hand, as we have also noted, the strategy also precluded the State from introducing significant evidence of defendant's other bad acts after the age of eighteen.
Defendant's expert, Carl Herman, claimed that the overarching strategy was error because defense counsel could have *813 attempted to exclude the State's rebuttal evidence on other grounds, or to reduce the harm caused by the introduction of such evidence if it were admitted over objection. He opined that counsel's strategy of limiting the mitigating evidence up to age eighteen was unreasonable, and that counsel's performance in the penalty phase was ineffective.
Strategic choices made after a reasonable investigation are entitled to great deference. They should not be second-guessed when viewed through the lens of twenty-twenty hindsight or the results of the case, or there will never be finality to litigation. Strickland, supra, 466 U.S. at 690-91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; Chew, supra, 179 N.J. at 217, 844 A.2d 487; Bey, supra, 161 N.J. at 251-52, 736 A.2d 469. Here the decision was sufficiently informed to pass constitutional muster because while it may have precluded the admission of beneficial mitigating evidence, it was designed to preclude the admission of powerful rebuttal evidence, and the rebuttal evidence was potentially more harmful than the evidence that defense counsel chose to forego. This weighs against finding a strategic error. See, e.g., Harris, supra, 181 N.J. at 486-92, 859 A.2d 364 (no error in defense counsel's mitigation strategy of excluding all evidence related to defendant's life between ages thirteen and forty-two, and thereby not pursuing mitigating factors relating to defendant's state of mind at time of crime, since this strategy limited State's damaging evidence as well); DiFrisco, supra, 174 N.J. at 221-32, 804 A.2d 507 (no error in failure to introduce certain mitigating evidence, where introduction of that evidence would have opened the door to introduction of negative information about defendant); Bey, supra, 161 N.J. at 261-64, 736 A.2d 469 (no error in failing to present cumulative mitigating evidence of child abuse and alcoholism; counsel made reasonable tactical decision to avoid introduction of evidence relating to defendant's past sexual crimes, which had "propensity to demonize defendant in the eyes of the jury"); Martini, supra, 160 N.J. at 261-68, 734 A.2d 257 (no error in failing to present mitigating evidence that had mixed value and would have opened the door to damaging rebuttal evidence from the State). Moreover, as the Supreme Court has already noted, the jury heard "an enormous amount of mitigating evidence about defendant's tragic childhood" from which it was able to inferentially tie the events of defendant's childhood to the crimes charged and penalty issues. Cooper, supra, 151 N.J. at 345, 700 A.2d 306. Based on what was presented on the PCR, we doubt any additional mitigating evidence would have changed the unanimous decision that the aggravating factors outweighed the mitigating each juror found. Bey, supra, 161 N.J. at 262, 736 A.2d 469.
On the record presented, we agree with Judge Kreizman that there was no showing sufficient to satisfy the Strickland/Fritz test with respect to the penalty phase. By reading the Supreme Court's opinion on the direct appeal, one will appreciate the strength of the evidence and arguments made in an effort to save defendant from imposition of the death penalty. However we examine a few of the contentions in further detail.

A.
Defendant argues that he was denied effective assistance of counsel in the penalty phase because McMahon was inexperienced and had insufficient time to prepare, he did not request a continuance, and as a result he did not obtain or present evidence on FAS and the resulting damage to defendant's brain. While not without difficulty, we reject the claim because *814 even assuming he could have obtained a continuance, (a) the defendant did not demonstrate how Doctors Willard-Mack, Rotgers and Sadoff, experts retained by Aifer before McMahon entered the case, could have benefited defendant had there been a continuance; and (b) as already stated, there is little to suggest that by identifying yet another mitigating factor, the existence of FAS, and producing evidence thereof, the balance of aggravating and mitigating factors would have been different.[10]
In the thirty days between the end of jury selection and the beginning of trial, McMahon was instrumental in obtaining an expert to support a theory of accidental death and preparing mitigation materials, communicating with a mitigation specialist, working to get witnesses lined up, meeting with lay witnesses and experts Aifer had already retained, and retaining additional experts. But these were not the experts on which defendant relies for PCR, and the experts on which defendant now relies were not retained by Aifer.
The theory on which defendant primarily relies for his claim of ineffectiveness is the failure to develop his FAS diagnosis. While Aifer's experts, Willard-Mack and Sadoff, may well have recommended to her that this area be developed by other experts, it was not done by the time of trial and would not have been presented even if Aifer had remained in the case. The substitution of McMahon for Aifer bought the defense more time. It can hardly be suggested that Aifer would have achieved a better result than McMahon.
Apparently, the experts McMahon contacted were either unable to sustain a diagnosis of FAS, or were unable to work with him in the timeframe available. There is no legitimate basis for suggesting that the court would have given defendant a continuance if Aifer remained in the case and requested it, or had McMahon requested a further adjournment on the same basis.
The issue then becomes whether the record at the PCR hearing demonstrates that the failure to request or obtain an adjournment could have affected the result such that a new penalty proceeding is warranted.
At the PCR hearing defendant developed his claim that he suffered from FAS and that presentation of that fact at the penalty phase would have affected the result. The expert testimony was developed for the PCR.
In diagnosing fetal alcohol syndrome, experts consider the mother's history of drinking during pregnancy and whether the child experienced growth deficiencies, unusual facial characteristics and central nervous system deficits. Previously, fetal alcohol effects (FAE) was a diagnosis that *815 was applied to patients who did not experience all three consequences. By the time of the PCR, FAS and FAE were collectively referred to as fetal alcohol spectrum disorder (FASD).
Dr. Natalie Novick Brown, a clinical and forensic psychologist, testified at the PCR hearing that FAS is "a catastrophic birth defect that's caused by exposure of the fetus to alcohol ingested during the pregnancy," causing defects in an individual's executive functions, and creating a condition where those with FAS are "unable to formulate an intent to do something and then carry out that behavior in a goal-directed, meaningful way." She also described FAE as "a diagnosis that was applied to any patient who didn't meet all three criteria" for FAS, and could even be more severe than FAS. Brown also testified that there are several secondary disabilities that are often common with FAS or FAE, including law-breaking behavior.
Brown further testified that there were several records which provided a history of maternal drinking, one of the criteria for a finding of FAS, and records to support a finding of defendant's growth deficiency. She testified that premature birth is very common in FAS and FAE cases, and the fact defendant was two months premature was "a red flag."
Brown also testified that the dysmorphology (facial abnormalities) criterion is often absent in FAS cases where a mother did not ingest alcohol during the first trimester, and thus absence of the criterion was not conclusive. Brown stated that the available childhood photos of defendant were of such poor quality that the dysmorphology criterion was inconclusive.
A psychological evaluation of defendant as a child noted his problems with "urinating on furniture and in bedroom closets and in ornamental vases," which Brown indicated was evidence of "executive function deficits." Brown indicated that such behavior is common in FASD patients, and is also rather unique to that condition. She also found a number of records that indicated defendant had numerous learning disabilities, another symptom of FAS. There were also records indicating defendant suffered from a number of developmental delays.
Brown further testified regarding defendant's lack of ability to properly plan and regulate his behavior. She pointed out that defendant only exhibited a "primitive" attempt to conceal his crime by boarding the porch back up, thereby demonstrating behavior indicative of FAS. Finally, Brown stated she did not find any evidence that was inconsistent with her diagnosis of FAS, and that she would have made the same diagnosis if she had been retained to do so in 1995.
Jill Miller, a forensic social worker, was retained for purposes of developing the FASD diagnosis after the conviction, but before the penalty phase. She testified that she interviewed several people who indicated that defendant's mother had used alcohol, and perhaps drugs, during the pregnancy. Miller indicated that the defendant had several symptoms of FAS, such as a premature birth, low birth weight, being colicky as an infant, and being hyperactive as a child. But Miller was not able to find early childhood pictures of the defendant, which are useful in finding any facial features that would be indicative of FAS.
In his review of an MRI of defendant's brain, Dr. Fred Bookstein, a professor of statistics specializing in morphometrics (the study and measurement of medical images and biological shapes), noted abnormalities in defendant's corpus callosum, which in his opinion, were "clearly consistent with structural damage due to alcohol," *816 and such a reading would have been evident to those involved in studying FAS/FAE in 1995 if they had reviewed the April 1995 SPECT, which showed areas of decreased brain activity, or had taken an MRI in 1995. Bookstein acknowledged, however, that the abnormalities in the corpus callosum were not unusual in the general population, and such abnormalities were also related to disorders other than FASD.
Dr. Robert Pandina, the neuropsychologist who also gave an evaluation concerning intoxication, testified that the medical records regarding defendant's birth, with his low birth weight and breathing problems, and his heart defects, indicated other risk factors that could have led to "brain dysfunction and behavioral dysfunction later in life." Pandina also pointed to defendant's learning difficulties as a child and damage to defendant's corpus callosum as indicative of FASD.
Dr. Michael Gelbort, a clinical neuropsychologist, examined defendant and issued a report in 2005. Gelbort testified that defendant suffered from "abnormal" brain functioning, with his most significant deficits in the areas of attention, concentration, and cognition. According to Gelbort, this diagnosis was supported by defendant's performance problems in school. The diagnosis also was consistent with defendant's having been exposed to alcohol in utero, his having abused drugs and alcohol in adolescence, and his having suffered from periods of hypoxia or anoxia (oxygen deprivation) during childhood.
Contradicting this defense testimony, the State presented documentary evidence that defendant had been considered a normal child, without any recognized brain damage, mental problems, or fetal alcohol syndrome. He had experienced some respiratory problems, and he had undergone heart surgery at three years old, but he was otherwise healthy, and as a young child his head was described as "normal in size and shape." His emotional and behavioral problems were first recorded after his mother's death in 1980.
At the PCR hearing, the State presented the testimony of psychiatrist Timothy Michals and psychologist Steven Samuel, although neither of them had an expertise in FAS, FAE, or FASD. Michals, the psychiatrist who testified for the State at the trial, had acknowledged at trial that defendant suffered from an antisocial personality disorder. However, he had not examined defendant before the trial in 1995, and his opinion had been based only upon a review of defendant's records. Since that time, Michals had reviewed the additional documentation produced with respect to defendant's PCR petition, and he interviewed defendant in the context of the PCR proceedings, on February 28, 2006.
Michals found that defendant's cognitive abilities, including memory, concentration, and higher intellectual functioning, were intact. He found no cognitive impairments relating to any mental disease or defect or fetal alcohol syndrome. He based these conclusions upon his interview of defendant, in which defendant appeared knowledgeable about the details of his case, and very articulate in expressing that knowledge. Michals noted that defendant's letter to a friend after his arrest in 1994 revealed that defendant "has the capacity to organize his thinking in a logical manner; to express statements and concerns." Michals also noted there was no indication in any prison record that defendant suffered from "any cognitive impairment."
Michals took issue with the defense experts' diagnoses of FASD, noting that despite an abundance of contacts with medical professionals throughout his lifetime, defendant had never been diagnosed with fetal alcohol syndrome. Michals found *817 that, at most, defendant had "a history consistent with a diagnosis of alcohol abuse as well as a personality disorder with borderline and antisocial traits."
Samuel, a clinical and forensic psychologist, examined defendant in March 2006, and issued a report dated March 27, 2006. He diagnosed defendant with a personality disorder, and stated that defendant's test results revealed the profile of "a tense young man" with a "paranoid personality makeup" and "antisocial tendencies," and a tendency "to be hostile and to be tense." At the same time, defendant had an average IQ and good cognitive functioning, including executive functioning, which meant that his psychological and neuropsychological problems did not affect his ability to understand or process information or to organize his thoughts and express them in a logical way.
Finally, the State presented Dr. Huey-Jen Lee, Director of Neuroradiology at UMDNJ, to contradict Bookstein's testimony regarding the damage to defendant's corpus callosum. Lee examined defendant's 2005 MRI relied upon by Bookstein, and concluded that his brain was normal, including the corpus collosum. According to Lee, "narrowing of the corpus collosum... is not evidence ... of fetal alcohol syndrome" and defendant's brain showed no evidence of damage from fetal alcohol syndrome or otherwise.
In rebuttal, the defense presented additional testimony from Bookstein. He repeated his earlier conclusions and disagreed with Lee's evaluation of the MRI. Boodstein found distortions or "waviness" in defendant's corpus callosum as revealed in the MRI reviewed by Lee, and believed they were signs of damage caused by prenatal alcohol exposure.
The defense also presented the testimony of Dr. Angela Hegarty, an expert in forensic neuropsychiatry and FASD, who prepared a report dated May 9, 2006. She believed Michals was not qualified as an expert in FAS based on his training. Contradicting Michals' testimony, Hegarty stated that defendant's records supported a diagnosis of fetal alcohol syndrome or effects. Also contrary to Michals, Hegarty found no significance to the fact that defendant had not been diagnosed with fetal alcohol syndrome as a child, because defendant was born in 1970, and a diagnosis of fetal alcohol syndrome was not seriously considered until the 1980s. Hegarty also took issue with Michals's assessment of defendant based upon his functioning in prison; she said that the structured environment of a prison has a tendency to limit an individual's problems with executive functioning, so defendant's problems would not be on full display in that setting. On cross-examination, Hegarty acknowledged she did not know how much defendant's mother drank during pregnancy, and that many mothers who drink during pregnancy do not give birth to children with FASD.
Finally, the defense presented Dr. Mark Cunningham, an expert in clinical and forensic psychology who had observed the interviews of defendant performed by Samuel and Michals, and reviewed a variety of documentary records. Cunningham found that Michals's interview of defendant was "relatively superficial and cursory." He agreed with Michals that defendant was "very obviously not demented" and "his cognitive functioning was grossly intact" in that you could "sit and carry on a conversation with him" and "not ... immediately identif[y] him as somebody who was cognitively impaired or disturbed." However, according to Cunningham, Michals did not delve deep enough "to assess [defendant's] cognitive capability in a more meaningful or more substantial *818 way," and his conclusions based solely on his casual observations were unreliable.
Moreover, Cunningham found significant factual errors in Michals's report. Cunningham believed that Michals understated defendant's drinking in general and on the night of the offense, as well as his problems with attention and focusing. According to Cunningham, Michals misreported defendant's description of the crime and his post-crime conduct, and he minimized defendant's emotional response to his offense.
Cunningham found similar problems with Samuel's assessment of defendant, and found it "[i]nadequate in scope and depth." He believed Samuel had performed only a superficial interview and testing of defendant, which were appropriate only for gauging defendant's gross cognitive abilities and detecting dementia. Samuel failed to probe deeply or to follow up on defendant's responses to the questions, and he minimized or inaccurately recited defendant's reported problems.[11]
As already developed, the State presented three aggravating factors at the penalty stage:
(1) that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind, N.J.S.A. 2C:11-3c(4)(c); (2) that the murder occurred during the commission of an aggravated sexual assault or kidnapping, N.J.S.A. 2C:11-3c(4)(g); and (3) that the purpose of the murder was to escape detection or apprehension, N.J.S.A. 2C:11-3c(4)(f).

Cooper, supra, 151 N.J. at 344-45, 700 A.2d 306.
The jury unanimously rejected factor 3c(4)(c), that the murder had involved depravity, but unanimously found the State had proven the presence of the other two factors. Id. at 345-46, 700 A.2d 306.
The defense "submitted eighteen mitigating circumstances related to defendant's life." Id. at 345, 700 A.2d 306. Of those eighteen mitigating factors presented, the jury unanimously rejected two of them and unanimously accepted one ("(2) that [defendant] had been born to drug and alcohol-dependant parents.") Id. at 346, 700 A.2d 306. The other fifteen factors were found by anywhere from two to ten jurors. Id. at 346, 700 A.2d 306. Two jurors found that "Casandra Cooper drank to intoxication and abused drugs during her pregnancy with [defendant], contributing to his physical and developmental disabilities." Despite the mitigating factors that were found, "the jury unanimously found that the two aggravating factors together outweighed the mitigating factors beyond a reasonable doubt." Id. at 347, 700 A.2d 306.
Despite the contested proofs, it is possible that with the evidence presented at the PCR hearing, another mitigating factor, or one similar to the factor related to his mother's drinking during pregnancy, might have been found by the jurors, and the balance might conceivably have been affected. After reviewing the PCR testimony, Judge Kreizman found that "defendant suffered from FAS, FAE and/or FASD to some degree." Based on this, he also found that defendant's "trial counsel's performance fell below an objective standard for reasonableness for failure to present evidence of Cooper's FAS in one or both parts of the trial," thereby meeting the first prong of Strickland.
However, the judge found that the second Strickland prong was not satisfied. In so doing and considering the testimony *819 regarding FAS and its possible effects on defendant's penalty phase verdict, he considered whether it would have formed the basis for a new mitigating factor, or impacted on one of the presented factors the jury considered. Reviewing the list of factors that the jury considered, the judge noted the FAS evidence seemed to fit within the third mitigating factor found by two members of the jury, "that drinking by his mother during pregnancy had contributed to defendant's physical and developmental disabilities." Id. at 346, 700 A.2d 306. Judge Kreizman concluded that despite the fact that the jury had been presented with considerable evidence of defendant's troubled childhood and that his background had led to a personality disorder that caused him to commit this crime, the jury still sentenced him to death. Even those who found mitigating factor three, or other mitigating factors related to his youth, nurturing and upbringing, found the aggravating factors outweighed the mitigating factors. Thus Judge Kreizman found that the evidence of FAS presented on the PCR would not have made a "difference" regarding the penalty verdict.
This finding is supported by the evidence presented at the PCR hearing. Significantly, even the two jurors who found that defendant had developed physical and developmental disabilities as a result of his mother's drinking during pregnancy also found that defendant had carried out the murder to avoid detection and during the course of a sexual assault and kidnapping, and that the two aggravating factors outweighed the mitigating factors. If additional jurors found another mitigating factor present, and that defendant suffered from FAS or FASD, it can hardly be said that "there is a reasonable probability that ... the jury's penalty-phase deliberations would have been affected substantially." Marshall, supra, 148 N.J. at 250, 690 A.2d 1.[12] This is what Judge Kreizman found in regard to the second prong of Strickland, when he concluded
I find that this jury, irrespective of the designation, knew of [defendant's] troubled childhood. The overwhelming evidence presented during the trial revealed that as a result of that chaotic childhood, including birth from an alcoholic mother who drank during her pregnancy with [defendant], that he suffered from a personality disorder which manifested in his committing this unspeakable crime. I find that not one juror would have ... changed his or her vote for the death penalty, even had he or she known of FASD.
We hold, as has the Supreme Court in other capital cases involving ineffective assistance claims, that defendant has not demonstrated there was a reasonable probability that the deliberations would have been affected substantially if the omitted evidence were presented. See, e.g., Bey, supra, 161 N.J. at 262-64, 736 A.2d 469 (failure to present evidence of drug and alcohol abuse); State v. Morton, 155 N.J. 383, 431-32, 715 A.2d 228 (1998) (failure to provide background information and history of defendant); State v. Purnell, 126 N.J. 518, 536-37, 601 A.2d 175 (1992) (Court couldn't say continuance and subpoena of witness would have benefited defendant).

B.
Defendant argues that his trial counsel were ineffective in the penalty phase by *820 "fail[ing] to submit the statutory mitigating factor of diminished capacity due to mental defect to the jury or to present any direct testimony that [he] suffered from organic brain damage or mental disturbance at the time of the offense." See N.J.S.A. 2C:11-3(c)(5)(a) and (d).[13] This issue, of course, is a restatement of the claim relating to defense counsel's failure to fully investigate and present evidence in the penalty phase regarding fetal alcohol syndrome, the alleged primary source of defendant's organic brain damage and mental illness.
Initially, Judge Kreizman rejected this argument for the same reasons he rejected the argument about intoxication as a mitigating factor, namely that counsel adequately investigated the matter and made a reasonable strategic decision not to present these mitigating factors to the jury, and that in any event the jury heard substantial evidence on this issue and any additional evidence would have been cumulative.
After the remand hearing, the judge found that McMahon "ran out of time to obtain an expert" on fetal alcohol syndromemental disease or defect, and erred by not presenting any such evidence in either the guilt or penalty phases of the trial. However, he found that the defense, "while not specifically introducing evidence of FAS, et cetra, ... did present evidence of the mental disease" by the case that was presented. In any event, the judge concluded that any error did not affect the guilt or penalty phase verdicts. His reasoning about the lack of "prejudice" was incorporated into the analysis about the FAS diagnosis, and he noted that the jurors had been presented with a lot of evidence regarding defendant's life, including the tragic effects of his pre- and post-natal exposure to alcohol, and this had not swayed them to reach a non-death sentence. For the reasons we have previously given regarding the FAS diagnosis, we affirm his conclusion regarding mental disease and defect as a mitigating factor.

IX.XI.
[At the court's request portions of the opinion rejecting challenges unique to the penalty phrase of the trial are omitted for purposes of publication.]

XII.
In sum, the defendant was convicted and sentenced to death based on the evidence of his murder of a six-year-old girl, and the aggravating factors presented. The jury learned all about his terrible childhood, although lacking the FAS or FASD diagnosis. He does not even challenge the kidnapping conviction into which the aggravated sexual assaults were merged, and he received a thorough and fair PCR hearing.

XIII.
The denial of post conviction relief is affirmed.
NOTES
[1] Despite the merger, the trial judge apparently sentenced defendant to thirty years to life imprisonment on the felony murder. Id. at 347, 700 A.2d 306. As that sentence was not addressed on the direct appeal, id. at 406, 700 A.2d 306, we now vacate the sentence for felony murder.
[2] We recognize that in remanding the PCR case to us, the Supreme Court's order of February 8, 2008, recites that "all issues relating to defendant's death sentence have been rendered moot." Cooper, supra, 194 N.J. at 258, 944 A.2d 22. We read this recital as relating only to the ability to put defendant to death, not as otherwise addressing defendant's sentence. This question was discussed at oral argument before us in light of our holding in State v. Fortin, 400 N.J.Super. 434, 948 A.2d 160 (App.Div.2008) and in any event, despite the State's initial motion to dismiss the appeal as moot, the State did not press this issue before us, and has not responded to defendant's letter written after Fortin was decided by the Supreme Court, contending that the appeal is not moot.
[3] In the words of the Court, "[a]t trial, the defense conceded defendant's guilt of felony murder, kidnapping and aggravated sexual assault. The defense contested, however, that the murder was purposeful or knowing. Instead, defendant contended that the killing had occurred accidentally during the course of an aggravated sexual assault." 151 N.J. at 342, 700 A.2d 306. In the words of defense counsel David Donnelly in his guilt phase summation, "... if you accept the confession, there is no doubt that they have proven kidnapping. They have proven a sexual assault. They have proven that [L.G.] died at the hands of Mr. Cooper." Counsel argued, however, that as death was the result of an accident, defendant could not have been guilty of purposeful or knowing (capital) murder.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The evidentiary hearing on this issue followed the Supreme Court's remand order.
[6] Adams issued another report in connection with the PCR petition, in which he was critical of the medical examiner's trial testimony. However, Adams was not called as a witness in the PCR proceedings.
[7] Padula had become a captain by the time he testified.
[8] Dr. Rotgers attended Michals' testimony and helped frame the cross-examination.
[9] We reject the State's "invited error" argument premised on the Public Defender's refusal to permit Aifer to remain in the case after her resignation and defendant's opposition to the State's endeavor to oppose her removal. According to the State, Aifer's removal from the case constitutes "invited error," something defense counsel aggressively pursued and succeeded in obtaining. The issue of Aifer's representation was decided by the Public Defender independent of defendant, and he can now raise the issue even though his trial counsel, assigned by the Public Defender, did not. In any event, defendant's claim is premised on the quality of representation he actually received from the attorneys that ultimately represented him.
[10] We also note that at a penalty phase retrial under Fortin, it is even more unlikely that the jury would balance the aggravating and mitigating factors differently because, given the voir dire to be conducted and the jury instructions, the jurors would no longer be advised that death is a consequence of the balancing. In other words, the impact of knowing the death penalty is not involved may affect the balance. We recognize that in Fortin the Supreme Court stated that "[i]f the jury finds the State has met its burden of proof to impose the death penalty, then we conclude that there is no ex post facto violation in the application to defendant of the amended statute's life without parole sentence...." 198 N.J. at 631, 969 A.2d 1133. See also id. at 633, 969 A.2d 1133. We read that language as relating to the balancing process, not that the jury should be told defendant would be put to death if the aggravating factors outweigh the mitigating. However, as we evaluate the ineffective assistance argument in the context of the proceedings at the time of the trial, and the fact defendant could have received a sentence of thirty years to life if the death penalty were not imposed, we do not speculate on the possible consequences of a retrial.
[11] In his opinion, Judge Kreizman said he was "most impressed" with Dr. Samuel and therefore "discount[ed]" the opinion of Dr. Cunningham.
[12] It must be remembered that an aggravating factor must be found unanimously, but that "[e]ach juror ... should individually determine the existence of mitigating factors and then individually decide whether the aggravating outweigh the mitigating factors beyond a reasonable doubt." Bey, supra, 112 N.J. at 161, 548 A.2d 887.
[13] N.J.S.A. 2C:11-3(c)(5)(a) (repealed) provided as a mitigating factor that "[t]he defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." N.J.S.A. 2C:11-3(c)(5)(d) (repealed) provided as a mitigating factor that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect ... but not to a degree sufficient to constitute a defense to prosecution."