34 A.3d 801

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DAVID
BAYLOR, A/K/A F. BAYLOR, A/K/A BLACK FACE, A/K/A
BLACK, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 4, 2011—Decided December 29, 2011.

582

Before Judges MESSANO, YANNOTTI and KENNEDY.

*Joseph E. Krakora,* Public Defender, attorney for appellant (*Karen E. Truncale,* Assistant Deputy Public Defender, of counsel and on the brief).

*Paula T. Dow,* Attorney General, attorney for respondent (*Brian Uzdavinis,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

Defendant was tried before a jury and found guilty on four counts of first-degree murder and other offenses. Defendant appeals from the judgment of conviction dated September 19, 2008. He challenges the convictions and the sentences imposed. For the reasons that follow, we affirm.

I.

We briefly summarize the facts, based upon the evidence presented at trial. With money provided by the Federal Bureau of Investigation (FBI), Lorenzo Gonzalez (Gonzalez) operated an after-hours club called "Kings Court" in Paterson. The club was intended to attract certain "high-level" gang members who the FBI was tracking and investigating.

On the evening of December 13, 2005, Beatriz Hernandez (Beatriz) went to a club in Passaic with Debbie Aponte–Tovar (Aponte–Tovar) and two men. Defendant was at the club with Hamid Shabazz (Shabazz) and Reginald Barris (Barris). Beatriz told them that there would be gambling and a lot of money at Kings Court and they should rob that establishment. Between

1:55 and 2:30 a.m., Beatriz and Aponte–Tovar left and drove to Kings Court.

When they arrived there, Beatriz and Aponte–Tovar found Gonzalez and two men playing pool. A short while later, defendant arrived with Shabazz, Barris and Maurice Fabor (Fabor). Others were present at Kings Court, including Michael Almonte (Almonte), Ralph Hernandez (Hernandez), Jesus Gonzalez (Jesus), John Melendez (Melendez) and Tara Woods (Woods).

After a while, Beatriz moved to the dice table. She observed about $5000 on the table. Beatriz left the table and confirmed with defendant and Shabazz that the robbery was going to take place. Barris became very intoxicated and went outside. Defendant and Shabazz followed. Beatriz thereafter opened the back door and defendant and Shabazz came back inside. They were both wearing black masks and defendant had a gun.

Gonzalez was standing at the gaming table with Hernandez and Beatriz. When Gonzalez stood up to count his money, he heard a loud bang. Defendant had shot Jesus. Defendant then walked over to the pool table where Woods was playing. She asked defendant not to kill her, but he told her to "[s]hut the fuck up" and shot her in the head. Beatriz asked defendant what he was doing. Defendant did not respond. He then shot Melendez and Hernandez. Beatriz and Aponte–Tovar ran out the back door of the club, met Fabor who was already outside, and got into Beatriz's truck and drove away. Beatriz headed towards the highway but stopped to pick up defendant and Shabazz. Shabazz told her to drop them off near a store in Paterson. According to Beatriz, during the drive, defendant and Shabazz joked about the shooting and talked about dividing the money. Defendant and Shabazz offered Beatriz some money but she refused to accept it.

Officers of the Paterson Police Department (PPD) were dispatched to Kings Court. Emergency personnel confirmed that all four victims of the shootings were dead. Gonzalez told the police that he believed the suspects were associated with the Bloods gang. The police showed Gonzalez photographs of certain known

gang members, and Gonzalez identified Barris, Hernandez and Aponte–Tovar as persons who were present at the club that evening. Gonzalez testified that he told the police defendant was the shooter.

Beatriz thereafter spoke on the phone with the PPD detectives. Later, she went to police headquarters and provided the detectives with a statement denying that she conspired to commit the robbery. The detectives showed Beatriz certain photographs and she identified defendant, Barris and Shabazz as persons involved in the incident. She identified defendant as the shooter. Beatriz also told the detectives that Fabor was present at the club on the night of the shootings.

Aponte–Tovar left the state after the shootings. She returned after she was told that the PPD knew she was at Kings Court at the time of the shootings and knew where she could be located. Aponte–Tovar identified photographs of defendant, Barris, Shabazz and Beatriz as persons involved in the incident. In addition, Almonte informed the police that he was a witness to the shootings. He was shown photographs of gang members and he identified Barris as one of the perpetrators of the robbery.

On December 16, 2005, criminal complaints were filed against defendant, Barris and Shabazz. Shabazz was arrested in Passaic on December 18, 2005. At the request of the Paterson police, Shabazz phoned defendant, who told Shabazz that the police had been at his house. The police overheard the conversation. On December 20, 2005, defendant turned himself in at police headquarters and he was arrested.

Defendant was informed of his *Miranda* rights.[1] He agreed to waive those rights and give the detectives a statement. Defendant acknowledged that he had been at Kings Court on the night of the shootings. He said that he went to the restroom and when he returned, he heard gunshots. The detectives asked defendant

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

why three people would "point the finger" at him, and he responded that it was "[b]ecause I'm Blood, I'm Blood and I have respect within this Blood thing."

Defendant said that Kings Court was a "gang place" but he denied seeing any members of the Bloods gang in the club on the night of the shootings. In addition, defendant denied that Fabor was a member of the Bloods. He stated that he was willing to "take the weight" for the shootings because he had "no choice."

The grand jury charged defendant with four counts of first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) or *N.J.S.A.* 2C:11–3(a)(2) (counts one, four, seven, and ten); four counts of first-degree felony murder, *N.J.S.A.* 2C:11–3(a)(3) (counts two, five, eight and eleven); four counts of first-degree robbery, *N.J.S.A.* 2C:15–1(a)(1) and (3) (counts three, six, nine and twelve); unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b) (count thirteen); possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a) (count fourteen); and certain persons not to have weapons, *N.J.S.A.* 2C:39–7(b) (count fifteen). Shabazz, Barris and Beatriz also were charged with various offenses.

Defendant was found not guilty on counts six and twelve (charging the robberies of Woods and Melendez, respectively) and thirteen (charging unlawful possession of a weapon) but guilty on all other charges. After merging certain offenses, the court imposed four consecutive life sentences without parole for the murders; two concurrent twenty-year sentences for the robberies, with periods of parole ineligibility as prescribed by the No Early Release Act, *N.J.S.A.* 2C:43–7.2; and a consecutive ten-year term for certain persons not to have weapons, with a five-year period of parole ineligibility. The court filed a judgment of conviction dated September 19, 2008.

Defendant appeals and raises the following issues for our consideration:

*POINT I*

THE DEFENDANT'S VIDEOTAPED STATEMENT WAS THE PRODUCT OF PSYCHOLOGICALLY COERCIVE INTERROGATION DURING WHICH THE

DETECTIVES FAILED TO HONOR DEFENDANT'S ASSERTION TO STOP TALKING.

A. The Defendant Was Subjected To Psychological Manipulation and Coercion.

B. The Defendant Asserted His Right To Stop The Interrogation.

*POINT II*

THE JURY INSTRUCTIONS WERE REPLETE WITH ERRORS ON KEY PRINCIPLES OF LAW, MISSTATEMENTS, AND OMISSIONS, RESULTING IN A DENIAL OF THE DEFENDANT'S RIGHT TO A FAIR TRIAL. (Not Raised Below).

A. The Omission Of Key Principles.

B. Misstatements Of Law.

C. The Court Failed To Give A Prior Contradictory Statement Charge.

*POINT III*

THE ADMISSION OF DEFENDANT'S ORAL STATEMENT BLATANTLY VIOLATES *N.J.R.E.* 403 WHICH SPECIFICALLY PROVIDES FOR THE EXCLUSION OF HIGHLY PREJUDICIAL EVIDENCE. (Not Raised Below).

*POINT IV*

THE TRIAL WAS PERMEATED WITH THE HIGHLY PREJUDICAL DE- SCRIPTION OF THE DEFENDANT AS A MEMBER OF THE BLOODS GANG. (Not Raised Below).

*POINT V*

THE COURT ERRED IN IMPOSING SENTENCES OF LIFE WITHOUT PAROLE UNDER THE AMENDED STATUTE *N.J.S.A.* 2C:11–3b(4) IN VIO- LATION OF THE EX POST FACTO CLAUSE. (Not Raised Below).

## II.

Defendant first argues that the trial court erred by admitting the videotaped statement that he gave to the investigating detectives.

When a defendant has been informed of his *Miranda* rights, due process requires that any waiver of such rights be made knowingly, intelligently, and voluntarily. *State v. Knight,* 183 *N.J.* 449, 461, 874 *A.*2d 546 (2005). The State must show "beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." *Id.* at 462, 874 *A.*2d 546 (citing *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993)).

In determining whether a defendant's statement was voluntary, the court must consider the " 'totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation.' " *Ibid.* (quoting *Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735). Those considerations include " 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved.' " *Id.* at 462–63, 874 *A.*2d 546 (quoting *Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735).

Here, the trial court conducted a hearing on defendant's motion to suppress his videotaped statement to the police. The record of that proceeding indicates that defendant voluntarily presented himself at police headquarters after a warrant was issued for his arrest. The detectives advised defendant of his *Miranda* rights. Defendant confirmed in writing that he understood his rights. He waived his *Miranda* rights and provided the detectives with a statement that was videotaped. The trial court found that, considering the totality of the circumstances, defendant made his statement voluntarily.

Defendant argues, however, that his statement should not be considered voluntary because the detectives subjected him to what he says was "psychological manipulation and coercion." Defendant asserts that the detectives presented themselves as friends who cared about his welfare; erroneously informed him that he faced the death penalty; reduced him to tears by applying "unrelenting pressure" on him to confess and/or name the shooter; attributed statements to him that were untrue and intended to "trick" him into making inculpatory statements; and lied about the evidence and witnesses against him.

The trial court found that the detectives did not subject defendant to any coercion, pressure or threats. Moreover, law enforcement officers may employ deception or trickery in an interrogation of a suspect unless such deception or trickery was calculated to produce an untruthful confession or was offensive to

due process. *State v. Manning*, 165 *N.J.Super.* 19, 30–31, 397 *A.*2d 686 (App.Div.1978), *certif. denied*, 81 *N.J.* 358, 407 *A.*2d 1231 (1979). The trial court found that the police engaged in some deception but it did not result in defendant making a statement he would not have otherwise made voluntarily.

The trial court's findings are binding on appeal if supported by sufficient, credible evidence. *State v. Elders*, 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) (citing *State v. Locurto*, 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999)). We are satisfied that the record supports the court's findings and its conclusion that defendant's statement was voluntary.

Defendant additionally argues that the investigating detectives failed to honor his "request" to terminate the interrogation. Defendant did not raise this argument in the trial court. In any event, the argument is without merit.

An individual may waive his or her *Miranda* rights and proceed with questioning, but "a decision to proceed, however, is not irrevocable." *State v. Burno–Taylor*, 400 *N.J.Super.* 581, 587, 948 *A.*2d 717 (App.Div.2008). " 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' " *Ibid.* (quoting *Miranda, supra*, 384 *U.S.* at 473–74, 86 *S.Ct.* at 1627–28, 16 *L.Ed.*2d at 723 (footnote omitted)). "New Jersey courts have recognized that even an ambiguous indication of a desire to remain silent is sufficient to require that questioning cease." *Id.* at 590, 948 *A.*2d 717. "[A] request to terminate an interrogation must be honored 'however ambiguous.' " *State v. Bey*, 112 *N.J.* 45, 64–65, 548 *A.*2d 846 (1988) (quoting *State v. Kennedy*, 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984)).

Defendant contends that when he told the detectives that he could not name the shooter because of his affiliation with the Bloods gang, he was "explain[ing] that he would not discuss the incident further." Defendant additionally contends that when he told the detectives he could not give them the name of the shooter,

he was asserting his right to silence and "it was incumbent upon the detectives to either end the interrogation, or, at least, ask if [defendant] wanted [to] stop."

We are convinced, however, that defendant's statement cannot reasonably be interpreted as an assertion of his right to remain silent. Defendant never told the detectives that he wanted the interrogation to stop. He never stated that he wanted to consult with an attorney. He never said that he did not wish to discuss the matter further. We are satisfied that defendant's statement that he could not name the shooter because of his gang affiliation was not an assertion of a right to remain silent.

We therefore conclude that the trial court did not err by admitting defendant's videotaped statement into evidence.

### III.

Next, defendant argues that the trial court erred in certain instructions to the jury. These arguments were not raised in the trial court. Therefore, we must determine whether any of the claimed errors constituted plain error, that is, an error "clearly capable of producing an unjust result." *R.* 2:10–2.

#### A. *Instructions on the robbery charges.*

Defendant contends that the trial court incorrectly omitted the following portion of the model jury charge on robbery:

> To find the defendant guilty of robbery, the intent to commit theft must precede or be coterminous with the use of force. In other words, the defendant must have formed the intent to commit a theft before or during his/her use of force. If you find the defendant formed the intent to commit a theft after his/her use of force, then he/she cannot be found guilty of robbery[.]
>
> [*Model Jury Charge (Criminal),* "Robbery" (2009).]

Defendant argues that this portion of the charge "was critical to a fair determination" of the charges.

In support of this argument, defendant relies upon *State v. Lopez,* 187 *N.J.* 91, 900 *A.*2d 779 (2006). In *Lopez,* the defendant struck and killed the victim. *Id.* at 93, 900 *A.*2d 779. Thereafter,

the defendant decided to steal the victim's jewelry. *Ibid.* The Court observed that "without the intention to steal evidenced by a theft or attempted theft, there can be no robbery." *Id.* at 98, 900 *A.*2d 779. The Court held that our robbery statute "requires that the threats of violence be carried out in furtherance of the intention to commit a theft." *Id.* at 101, 900 *A.*2d 779.

*Lopez* does not support defendant's argument in this case. Beatriz testified that she and the defendant had discussed committing the robberies at Kings Court before defendant arrived there, and that she took steps to facilitate the robberies by opening the back door so that defendant and Shabazz could return to into the club. Unlike *Lopez,* the evidence presented here indicated that defendant formed the intent to commit the thefts before he entered Kings Court, and he had the intent to commit the thefts when he shot Hernandez and Gonzalez. *Ibid.* In light of the evidence, the omission of the portion of the robbery charge quoted above was not plain error.

Defendant nonetheless argues that the trial court's instruction constitutes plain error because the jury determined that he did not commit the robberies of Woods and Melendez. Defendant asserts that if the omitted section of the charge had been included, he might have been acquitted of the robberies of Hernandez and Gonzalez. We disagree. The jury's findings can be rationally explained by the fact that the evidence established that Hernandez and Gonzalez were playing dice at the gaming table where Beatriz observed the money, while Woods and Melendez were at the pool table.

We are therefore satisfied that the omission of the aforementioned portion of the robbery charge was not an error "clearly capable of producing an unjust result." *R.* 2:10-2.

B. *Instructions on Identification.*

Here, the trial court instructed the jury on identification by stating that when:

> evaluating an identification you should consider the observations and perceptions on which each identification is based and the particular witness's ability to make those observations and perceptions. If you determine that the out of court identification of a particular ... witness is not reliable you may still consider the witness's in court identification of the defendant if you find it to be reliable.

The court further instructed the jury on the factors that are relevant to the reasonableness of the identification, including the witness's opportunity to view the suspect; the witness's degree of attention at the relevant time; and the certainty of the identification. The court told the jury to consider any inconsistencies or discrepancies in any identifications, as well as any other factors that the jury deemed relevant.

■ Defendant argues that the instructions were erroneous because the court failed to instruct the jury as follows:

> Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification.
>
> [*Model Jury Charge (Criminal)*, "Identification: in-court and out-of-court identifications" (2009).]

Defendant claims that the omission of this section of the model charge was plain error because identification was a significant issue in the case. Again, we disagree.

■ As noted, the court instructed the jury to consider the identification testimony and determine whether the identifications were reliable. The court's failure to instruct the jury that some identifications may be mistaken, even when made in good faith, was erroneous but the error was not "clearly capable of producing an unjust result." *R.* 2:10–2.

We note that Beatriz and Gonzalez, who both knew defendant from prior encounters, had identified defendant as the perpetrator of the charged offenses prior to, and at, trial. The jurors obviously found Beatriz's and Gonzalez's identification testimony reliable. We are convinced that it is unlikely the jury would have reached a different conclusion if the trial court had included the omitted language in its charge.

## C. *Instruction on Statements of Defendants.*

The trial court instructed the jury that it must determine whether defendant made the statements attributed to him, and whether all or part of those statements were credible. Defendant nevertheless argues that the court erred by failing to specify that this instruction applied not only to defendant's formal statement to the police, but also to statements he made to Shabazz during a telephone conversation that the police overheard. We disagree.

Defendant told Shabazz that he was going to get his gun and bulletproof vest and "party with the cops." However, during the interrogation, the police asked defendant about his statements to Shabazz. Defendant acknowledged making the statements, although he claimed that it was a "bluff." We are satisfied the court's instruction covered defendant's videotaped statement as well as the statements he made to Shabazz.

 Furthermore, defendant's statements to Shabazz were not critical to the State's case. Indeed, there was extensive evidence that defendant committed the charged offenses. Therefore, the court's failure to specifically state that its instruction applied to defendant's statement to the police as well as his statements to Shabazz was not error, let alone plain error.

Defendant additionally contends that the trial court erroneously amended its instruction to indicate that if any portion of defendant's statement was knowingly false, the jurors could draw an inference of his consciousness of guilt. The record does not support this contention. The court told the jury that, if it found that defendant was not telling the truth, it could consider that evidence along with all of the other evidence in the case.

Defendant also argues that the amended instruction "eviscerated" the portion of the charge in which the jury was told it could disregard defendant's statement if the jury found it was not worthy of belief. This argument is without sufficient merit to warrant discussion. *R.* 2:11–3(e)(2).

### D. *Instruction on Cooperation of Co-defendants.*

The trial court instructed the jury that Beatriz had been charged with certain offenses arising from this incident, including felony murder, robbery while armed, weapons charges, and conspiracy to commit robbery. The court told the jury that Beatriz pled guilty to the conspiracy charge but her plea could only be used in determining her credibility as a witness.

 The court further instructed the jurors that evidence regarding Beatriz's plea could not be used as evidence "that defendant is guilty of the crimes that [*Beatriz*] is charged with." Defendant did not object to this portion of the charge.

He argues, however, for the first time on appeal, that the trial court should have told the jury that the evidence of Beatriz's plea could not be used as evidence that *defendant* was guilty of the offenses that *he* was charged with. We are convinced that, although the trial court mistakenly referred to Beatriz rather than defendant in its instruction, the error was harmless.

The court's instruction informed the jury of the limited purpose to which Beatriz's guilty plea could be used. The court did not, however, instruct the jury that it could use Beatriz's plea as evidence *defendant* was guilty of any of the crimes with which he was charged. Moreover, as we stated previously, there was extensive evidence indicating that defendant committed the charged offenses. Thus, the error in the charge was not an error "clearly capable of producing an unjust result." *R.* 2:10–2.

### E. *Absence of Instruction on Prior Inconsistent Statements.*

 Defendant contends that the trial court erred by failing to instruct the jury on prior inconsistent statements. He claims that Beatriz and Gonzalez both gave pre-trial statements that were inconsistent with their trial testimony.

We are convinced that the absence of the instruction was not plain error. Here, the trial court told the jury that, in assessing the credibility of all of the witnesses, it should consider whether

any witness "was shown to have made any inconsistent or contradictory statement[.]"

That charge clearly covered any prior inconsistent statements by Beatriz and Gonzalez. Furthermore, defendant has not established that there were any significant differences between Beatriz's and Gonzalez's trial testimony and their prior statements.

We are therefore satisfied that, while the prior inconsistent charge should have been given, its absence was not an error "clearly capable of producing an unjust result." *R.* 2:10–2.

## IV.

Defendant argues that the trial court made two other errors that warrant reversal of his conviction. First, he contends that the court erred by admitting testimony regarding the statements he made to Shabazz in his telephone conversation. As we noted previously, in that conversation, which was overheard by the police, defendant told Shabazz that he was going to get his gun and bulletproof vest and "party with the cops." Defendant also argues that he was prejudiced by references during the trial to his membership in the Bloods gang. Neither argument was raised below.

We are convinced that the admission of testimony regarding defendant's statements to Shabazz was not erroneous. Defendant's statements were admissible pursuant to *N.J.R.E.* 803(c)(25) because they were statements against his interest. Moreover, exclusion of the evidence under *N.J.R.E.* 403 was not warranted because any prejudice from the admission of the statements did not "substantially outweigh" their probative value. *N.J.R.E.* 403.

Defendant's contention that he was prejudiced by the references during the trial to his membership in the Bloods gang also is without merit. Defendant told the police he was a member of the Bloods gang. Furthermore, the record reflects that, during the trial, defense counsel repeatedly raised the issue of defen-

dant's gang membership. Defendant should not be heard to complain that he was prejudiced by the references to his gang membership made during the trial when his own attorney raised that issue and made many of the references himself.

## V.

We turn to defendant's challenge to the sentences imposed for the murder convictions. The trial court imposed four consecutive life sentences, without the possibility of parole. Defendant argues that these sentences violate the *Ex Post Facto* Clauses of the Federal and State Constitutions. We disagree.

As we stated previously, the murders were committed in 2005. At that time, the criminal code allowed for the imposition of certain sentences for those convicted of murder, including the death sentence. *N.J.S.A.* 2C:11-3(b)(1) (2005) provided that:

Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

*N.J.S.A.* 2C:11-3(c)(1) (2005) required the court to conduct a separate sentencing proceeding to determine whether the death sentence should be imposed. In addition, the statute provided that the judge or jury must determine whether the State has proven that any aggravating factor exists, and whether the factor or factors outweighs any one or more mitigating factors beyond a reasonable doubt. The statute stated:

(a) If the jury or the court finds that any aggravating factors exist and that all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors, the court shall sentence the defendant to death.

(b) If the jury or the court finds that no aggravating factors exist, or that all of the aggravating factors which exist do not outweigh all of the mitigating factors, the court shall sentence the defendant pursuant to subsection b.

(c) If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b.

[*N.J.S.A.* 2C:11-3(c)(3) (2005).]

However, as a result of legislation enacted in 2000, persons convicted of murder, who were eligible for the death penalty under subsection (c) of the statute, but not sentenced to death, could be sentenced to a term of life imprisonment without parole under certain circumstances. *L.* 2000, *c.* 88, (codified at *N.J.S.A.* 2C:11–3(b)(4)). The statute stated:

[i]f the defendant was subject to sentencing pursuant to subsection c. and the jury or court found the existence of one or more aggravating factors, but that such factors did not outweigh the mitigating factors found to exist by the jury or court or the jury was unable to reach a unanimous verdict as to the weight of the factors, the defendant shall be sentenced by the court to a term of life imprisonment during which the defendant shall not be eligible for parole.

[*N.J.S.A.* 2C:11–3(b)(4) (2005).]

In 2007, the death penalty was eliminated. *L.* 2007, *c.* 204. *N.J.S.A.* 2C:11–3(b)(4) was amended to provide, among other things, that persons convicted of murder under subsections (a)(1) or (2), who committed the homicidal act by his or her own conduct, could be sentenced to life imprisonment without the possibility of parole if the jury found that the State has proven, beyond a reasonable doubt, one or more aggravating factors in *N.J.S.A.* 2C:11–3(b)(4).

This case came to trial in 2008. For sentencing purposes, the trial court required the jury to determine as to each murder, whether the State had proven, beyond a reasonable doubt, the existence of one of the aggravating factors in *N.J.S.A.* 2C:11–3(b)(4). No mitigating factors were presented to the jury.

The jury found that the State had proven beyond a reasonable doubt that defendant committed each murder while engaged in the commission of, an attempt to commit, or flight after committing or attempting to commit the murder. The jury also found that the State had proven beyond a reasonable doubt that defendant committed each murder while engaged in the commission, or an attempt to commit, or flight after committing or attempting to commit the robbery. These were aggravating factors under the law in effect in 2005. *See N.J.S.A.* 2C:11–3(c)(4)(g) (2005).

Defendant argues that he could not be sentenced to life imprisonment without the possibility of parole because the jury never found that the aggravating factors outweighed the mitigating factors. He contends that imposition of life sentences without parole based solely on the jury's findings of aggravating factors represents the application of the amendments to the murder statute enacted in 2007. He claims this is a violation of his rights under the Federal and State *Ex Post Facto* Clauses. We do not agree.

 As we have explained, the law in effect in 2005 provided that a person convicted of murder shall be sentenced to life without parole if the jury finds at least one aggravating factor, regardless of whether there were any mitigating factors or whether those mitigating factors outweighed the aggravating factor or factors. *See Cannel, New Jersey Criminal Code Annotated,* comment 4 on *N.J.S.A.* 2C:11-3 (2006). We are satisfied that the imposition of those sentences in this case is not an *ex post facto* punishment.

Defendant also argues that he cannot be sentenced to life without parole unless there is a new sentencing proceeding and the jury finds that the aggravating factors outweigh any mitigating factors. In support of this contention, defendant relies upon *State v. Fortin* (*Fortin IV*), 198 *N.J.* 619, 969 *A.*2d 1133 (2009).

In that case, the defendant committed a murder in 1994. *Id.* at 622, 969 *A.*2d 1133. The law in effect at the time permitted the imposition of the death penalty if the State proved beyond a reasonable doubt that one or more aggravating factors were present and they outweighed the mitigating factors. *Id.* at 622-23, 969 *A.*2d 1133. If the State failed to prove those two criteria, the defendant would be subject to life with a thirty-year period of parole ineligibility. *Id.* at 623, 969 *A.*2d 1133.

The defendant was convicted and the death penalty was imposed. *Ibid.* However, the Supreme Court reversed the conviction and ordered a new trial. *Ibid.* (citing *State v. Fortin* (*Fortin II*),

178 *N.J.* 540, 581, 843 *A.*2d 974 (2004)). The Court noted that in 2000, the Legislature had amended the murder statute to permit the imposition of life sentences without parole in certain capital cases. *Ibid.* (citing *Fortin II, supra,* 178 *N.J.* at 604, 843 *A.*2d 974). The Court held that application of this new law to the defendant would be unconstitutional, unless he waived his rights under the *Ex Post Facto* Clause. *Ibid.* (citing *Fortin II, supra,* 178 *N.J.* at 606, 843 *A.*2d 974).

The defendant was tried again and found guilty. *Fortin IV, supra,* 198 *N.J.* at 624, 969 *A.*2d 1133. However, before the penalty phase in the case, the Legislature again amended the murder statute to eliminate the death penalty and substitute a sentence of life without parole. *Ibid.* The Court noted that, under the amended statute, a life sentence without parole must be imposed if the State establishes beyond a reasonable doubt one or more of the statutory aggravating factors. *Ibid.*

The Court in *Fortin IV* held that sentencing the defendant to life without parole would violate the *Ex Post Facto* Clause. *Id.* at 629, 969 *A.*2d 1133. The Court observed that, under the law in effect when the defendant committed the murder, he could only be sentenced to either death or thirty years to life with a thirty-year period of parole ineligibility. *Ibid.*

The Court stated that, because the trial had not advanced to the penalty phase, the jury did not make findings that could have resulted in the imposition of the death penalty. *Ibid.* The Court said that, "considering only the non-death sentences, life without parole is a greater sentence than thirty years to life with a thirty-year parole disqualifier." *Ibid.*

We are convinced that *Fortin IV* does not apply here. That case concerned a comparison of the sentences that could be imposed under the murder statute in effect prior to 2000 and those that could be imposed thereafter. In *Fortin IV,* the Court expressly noted that the statutory amendments to the murder statute in 2000 permitted the imposition of life without parole under certain circumstances. *Id.* at 623, 969 *A.*2d 1133 (citing

*Fortin II, supra,* 178 *N.J.* at 581, 843 *A.*2d 974). The murder statute in effect when defendant committed the murders required the imposition of life sentences without parole when a jury finds at least one statutory aggravating factor.

In this case, the jury found as to each murder that the State had proven beyond a reasonable doubt two of the statutory aggravating factors. Because the law in effect when defendant committed the murders allowed for the imposition of life sentences without parole based on those findings, the sentences do not violate the *Ex Post Facto* Clauses of the Federal and State Constitutions.

Defendant also relies upon *State v. Cooper,* 410 *N.J.Super.* 43, 979 *A.*2d 792 (App.Div.2009), *certif. denied,* 201 *N.J.* 155, 988 *A.*2d 1177 (2010). In that case, the defendant was convicted of a murder committed in 1993 and sentenced to death. *Id.* at 49, 979 *A.*2d 792. The Supreme Court affirmed the murder conviction and capital sentence. *Ibid.* (citing *State v. Cooper,* 151 *N.J.* 326, 341–42, 700 *A.*2d 306 (1997), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000)). The Court also upheld the death sentence following proportionality review. *Id.* at 49–50, 979 *A.*2d 792 (citing *State v. Cooper,* 159 *N.J.* 55, 116, 731 *A.*2d 1000 (1999)).

Thereafter, defendant filed a petition for post-conviction relief (PCR), which was denied. *Id.* at 50–51, 979 *A.*2d 792. Subsequently, legislation was enacted abolishing the death penalty, and the Governor commuted defendant's sentence to life imprisonment without parole. *Id.* at 51, 979 *A.*2d 792. The Supreme Court remanded the matter to this court for consideration of defendant's appeal from the order denying his PCR petition. *Ibid.*

We stated that the abolishment of the death penalty did not render the appeal moot. *Id.* at 51, 979 *A.*2d 792. We noted that if the

defendant's conviction were to be set aside in the PCR proceedings, he would be entitled to a new trial and, if found guilty of capital murder, he would be in the same position as Fortin, subject to life without parole only after another penalty phase hearing in which the aggravating factor or factors were found to exist and to outweigh the mitigating. And if [the] defendant were found to have ineffective

assistance of counsel at the penalty phase only, or the sentence were otherwise set aside, he would be entitled to a new penalty phase hearing because the result could still impact the sentence. Under *Fortin*, life without parole, as opposed to a sentence with a thirty-year period of parole ineligibility, can only follow a penalty proceeding at which the aggravating factors were found to outweigh the mitigating. [*Fortin IV, supra*,] 198 *N.J.* at 633 [969 *A.*2d 1133]. Otherwise, ex post facto principles would preclude imposition of a sentence of life without parole.

[*Id.* at 52, 979 *A.*2d 792.]

Defendant's reliance upon *Cooper* is misplaced. The defendant in *Cooper*, like the defendant in *Fortin*, was convicted of committing a murder before the statutory amendments enacted in 2000 which allowed the imposition of life sentences without parole if the jury were to find at least one aggravating factor. Defendant in this case is not in the "same position" as the defendants in *Cooper* and *Fortin*. Thus, *Cooper* does not require a new penalty-phase hearing in this case.

Affirmed.