# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3782-18T4

STATE OF NEW JERSEY
IN THE INTEREST OF B.W.,
a Juvenile.

Submitted March 31, 2020 – Decided June 18, 2020

Before Judges Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket Nos. FJ-19-0220-17, FJ-19-0221-17, and FJ-19-0222-17.

George T. Daggett, attorney for appellant.

Francis A. Koch, Sussex County Prosecutor, attorney for respondent (Shaina Brenner, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

B.W. was adjudicated delinquent for sexually assaulting his two younger female cousins. The assaults occurred when B.W. was a juvenile and one cousin was between the ages of five and thirteen and the other was between the ages of seven and thirteen. Following a trial in family court, B.W. was adjudicated

delinquent based on conduct that, if committed as an adult, would have constituted first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (three counts: two related to one cousin and one related to the other cousin); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (three counts: two related to one cousin and one related to the other cousin); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (three counts: two related to one cousin and one related to the other cousin).

B.W. appeals his convictions arguing that a statement he gave should have been suppressed, he was improperly precluded from offering evidence that one of the victims may have been sexually assaulted by her father, and there was insufficient evidence supporting his convictions. We reject these arguments and affirm.

## I.

B.W. is the cousin of L.W. (Lynne) and L.W. (Lucy).[1] B.W. was born in April 1991, and he is seven and eight years older than his cousins Lynne and Lucy. Lynne was born in April 1998, and Lucy was born in October 1999. Between 2003 and 2015, the three cousins lived together in the home of their

---

[1] We use initials and fictitious names to protect privacy interests and the confidentiality of the record. R. 1:38-3(d)(5), (8).

grandmother. In addition to the three cousins, there were two other children and four adults living at that home.

In March 2017, when Lynne was eighteen years old and Lucy was seventeen years old, they reported the assaults to the police. In separate interviews, Lynne and Lucy explained that when they were between the ages of five and thirteen and seven and thirteen respectively, B.W. separately, and repeatedly, pulled their pants down and put his fingers into their vaginas and put his mouth on their vaginas.

When Lynne and Lucy made their disclosures, B.W. was twenty-five years old. He was contacted by detectives, one of whom was from the prosecutor's office, and on March 6, 2017, he came to the Hopatcong Police Station to be interviewed by the detectives. The interview was video recorded, and a transcript was prepared. At the beginning of the interview, a detective read B.W. his <u>Miranda</u> warnings.[2] B.W. then waived his rights and agreed to speak to the detectives. When asked if he had sexually assaulted his cousins, B.W. denied those direct accusations. In response to other questions, B.W. stated he could not recall such actions, but he did not deny what his cousins were alleging he did. In still other responses, B.W. vaguely suggested that it was possible that

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436, 467-69 (1966).

things may have happened. For example, he stated that he might have "play[ed] doctor" with his cousins, during which they rubbed toys down his body. B.W. also vaguely suggested that it was "likely" he might have done something with his cousins as children "exploring" and "experimenting."

The detective then encouraged B.W. to write letters to Lynne and Lucy to apologize. B.W. wrote two short handwritten letters. In those letters, he stated that he was "sorry for anything that may have happened" and hoped that both cousins would get "help and move on."

In June 2017, B.W. was charged with committing aggravated sexual assaults on Lynne and Lucy when he was a juvenile. B.W. was also charged with endangering the welfare of each child.[3] Thereafter, B.W. moved to suppress the statement he had given on March 6, 2017.

The family judge conducted an evidentiary hearing and heard testimony from one of the detectives who had interviewed B.W. B.W. also called Dr. Michael Richardson, a psychologist, to testify concerning the treatment he had given to B.W. after the accusations were made. After hearing the testimony and reviewing the recorded interview, the judge denied the motion to suppress the

---

[3] Initially, B.W. was charged with second-degree endangerment, but the State later moved to reduce those charges to third-degree charges.

A-3782-18T4

statement in an order entered on February 26, 2018. On the record, the judge explained the reasons for that ruling.

The judge found that B.W.'s statement to law enforcement personnel was made knowingly, intelligently, and voluntarily. In that regard, the judge noted that when B.W. was interviewed, he was an adult with a college degree. The judge also rejected B.W.'s arguments that he was subjected to repeated or prolonged questioning that had overwhelmed his will. In addition, the judge rejected B.W.'s argument that he had psychological conditions that interfered with his ability to provide a knowing, intelligent, and voluntary waiver. Specifically, the family judge rejected the testimony of Dr. Richardson who had testified that B.W. suffered from Asperger's Syndrome, anxiety, depression, and post-traumatic stress disorder and that some of those conditions had precluded him from providing a voluntary statement. In making that ruling, the judge pointed out that Dr. Richardson was not a forensic psychologist, had not reviewed the video of the interview, and was not familiar with B.W.'s academic achievements.

B.W. filed a motion for reconsideration. The court denied that motion in an order entered on July 3, 2018, and explained the reasons for that ruling in an accompanying written statement of reasons.

In June 2018, the court conducted a Rule 104 hearing to address the State's application to exclude certain evidence. B.W. had informed the State that he intended to introduce evidence that Lucy's father had allegedly sexually assaulted her when she was approximately three years old. At that hearing, the court heard testimony from the mother and grandmother of Lynne and Lucy and a detective. The mother testified that when Lucy was approximately three years old, she noticed a rash on and around Lucy's vagina. She then took Lucy to the hospital emergency room and a doctor asked if the father had molested Lucy. The mother initially stated that she believed the father had molested the child, but later retracted that statement. The family was living in Pennsylvania at the time and the Child Protective Services of Pennsylvania conducted an investigation, but did not find any evidence to substantiate that the father had molested Lucy. The father was not criminally charged and continued to live with the family.

Based on that evidence, the family judge found that the allegations were unsubstantiated and not supported by any evidence, including medical evidence. Accordingly, the judge excluded any evidence of these allegations under evidentiary Rules 403, 404(b), and 608(b).

A-3782-18T4

In July and August 2018, the family court conducted a three-day trial. The State presented testimony from Lynne, Lucy, and a detective. B.W. also testified and called his mother and grandmother to testify. At the time of the trial, Lynne was twenty years old, Lucy was eighteen years old, and B.W. was twenty-seven years old.

Lynne and Lucy both testified that from approximately 2003 to 2015, they lived at their grandmother's home. At that time, there were nine people living together at the grandmother's house: Lynne, Lucy, their parents, their sister, their brother, B.W. (their cousin), B.W.'s mother (their aunt), and the grandmother. The house had three bedrooms. The parents used one bedroom, B.W. used another bedroom, and the aunt used the third bedroom. Lynne and Lucy, together with their brother, sister, and grandmother, slept in the living room. The grandmother slept on the couch, the brother slept on a chair and ottoman, and the three girls slept on cushions or cots.

Lynne testified that B.W. began sexually assaulting her when she was five and the assaults continued until she was thirteen. Lynne explained that the first incident occurred when she and B.W. were in his room playing video games. B.W. started taking off her shirt and pants, but the aunt entered the room and took Lynne downstairs. Thereafter, when she was seven, B.W. began crawling

into the living room at night when everyone was asleep, and he would pull her pants down and use his hands and mouth to penetrate her vagina. She testified that these assaults primarily occurred at night for approximately ten minutes. She also explained that the assaults happened approximately four times a week.

Lynne first reported the assaults to her mother in 2016. She explained that she did not come forward before then because she was afraid that her siblings would be taken away and she would lose her family.

Lucy testified that B.W. began sexually assaulting her when she was seven and the assaults continued until she was thirteen. She explained that B.W. would silently crawl into the living room, pull the covers off her, slide her pants down, and would touch her vagina with his fingers and mouth. She stated that these assaults occurred at night approximately three to four times a month. Lucy testified that she informed her mother about the assaults in 2016 and decided to report the assaults to the police in 2017 because she was haunted by flashbacks and nightmares.

The detective who testified explained that he had interviewed Lynne and Lucy and, thereafter, interviewed B.W. The statement B.W. gave to the detective was then admitted into evidence and played during the trial.

In his testimony, B.W. denied sexually assaulting either Lynne or Lucy. Addressing his statement, B.W. testified that he was confused by many of the detectives' questions and his vague statements were made because he felt coerced by the detectives' repeated questions.

The grandmother and aunt both testified that they never saw or heard about B.W. sexually assaulting Lynne or Lucy. In that regard, the grandmother explained that despite sleeping right next to Lynne and Lucy, she never noticed B.W. assaulting the girls. She also testified that she had a good relationship with both Lynne and Lucy and would have expected them to have confided in her had B.W. been assaulting them.

The aunt testified that she never suspected anything was going on between B.W. and Lynne or Lucy. She also testified that she had good relationships with Lynne and Lucy and neither of them ever mentioned anything about B.W. assaulting them.

After hearing the testimony at trial, the family judge adjudicated B.W. delinquent for aggravated sexual assault and endangering the welfare of children. Specifically, the judge adjudicated B.W. delinquent on two counts of first-degree aggravated sexual assault against Lynne and one count of first-degree aggravated sexual assault against Lucy. The judge also adjudicated B.W.

delinquent on two counts of second-degree sexual assault against Lynne and one count of second-degree sexual assault against Lucy. Finally, the judge adjudicated B.W. delinquent on two counts of third-degree endangering the welfare of Lynne and one count of third-degree endangering the welfare of Lucy. Those adjudications were memorialized in an order issued on January 29, 2019.

Thereafter, B.W. was sentenced to three years of non-custodial probation and ordered to register under Megan's Law, N.J.S.A. 2C:7-1 to -23. B.W. was also directed to undergo a psychosexual evaluation and he was prohibited from having any contact with the victims. B.W. moved for reconsideration. The court denied that motion in an order entered on April 3, 2019, and issued an accompanying statement of reasons. B.W. now appeals from his convictions.

II.

On appeal, B.W. makes three arguments which he articulates as follows:

> POINT I - The [Trial Court] Erred in Failing to Suppress Juvenile B.W.'s Statement Because it did Not Consider the Totality of the Circumstances
>
> POINT II - The Testimony of the Two Victims Gives Rise to a Reasonable Doubt
>
> POINT III - The Trial Judge Erred in Deciding the Rule 104 Hearing

A-3782-18T4

We are not persuaded by any of these arguments and will address them in the procedural order in which they arose.

1. B.W.'s Statement

B.W. first challenges the trial judge's decision to deny his motion to suppress his statement. He argues that he did not knowingly waive his rights because he suffered from Asperger's Syndrome and had a limited intellectual capacity as demonstrated by his participation in the Special Olympics. He also argues that the detectives asked repetitive questions and overwhelmed his will by encouraging B.W. to "put" the situation behind him and to provide help to his cousins.

Our review of a trial court's factual findings on a motion to suppress is limited. State v. A.M., 237 N.J. 384, 395 (2019). The trial court's factual findings will be upheld "when 'those findings are supported by sufficient credible evidence in the record'" and should only be disturbed "if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Id. at 395-96 (first quoting State v. S.S., 229 N.J. 360, 374 (2017); then quoting State v. Elders, 192 N.J. 224, 244 (2007)). That same standard of review applies to "factual findings based on a video recording or documentary evidence." Id. at 396 (quoting S.S., 229 N.J. at 381). By contrast, we owe no

deference to "conclusions of law" and we review such legal questions de novo. Ibid. (quoting State v. Boone, 232 N.J. 417, 426 (2017)).

The "right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this [S]tate's common law, now embodied in . . . N.J.S.A. 2A:84A-19, and . . . N.J.R.E. 503." Ibid. (quoting S.S., 229 N.J. at 381-82). Before a defendant gives a statement, he must be advised of his Miranda rights.[4] Accordingly, "a defendant must be informed that he has the right to remain silent, that anything he says can and will be used against [him] in court, and that he has the right to have counsel present at the interrogation." Id. at 396-97 (alteration in original) (citations omitted).

The State must "prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." Id. at 397 (quoting State v. Presha, 163 N.J. 304, 313 (2000)). Accordingly, the question is "whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished." Ibid. (quoting State v. Nyhammer, 197 N.J. 383, 402 (2009)). That inquiry is "determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessment of the trial court."

---

[4] 384 U.S. at 467-69.

Id. at 398 (citation omitted). Relevant factors include "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

"[L]aw enforcement officers may employ deception or trickery in an interrogation of a suspect unless such deception or trickery was calculated to produce an untruthful confession or was offensive to due process." State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011) (citing State v. Manning, 165 N.J. Super. 19, 30-31 (App. Div. 1978)). A confession that is "the product of . . . psychological coercion must be" suppressed. State v. L.H., 239 N.J. 22, 43 (2019) (citations omitted). Nevertheless, psychological interrogation is "not inherently coercive" and a confession can only be deemed involuntary if "derived from 'very substantial' psychological pressures that overbear the suspect's will." State v. Cook, 133 N.J. 631, 562-63 (2004) (quoting State v. Galloway, 179 N.J. 533, 654, 656 (1993)).

The trial court here found that B.W. was given his Miranda rights, he voluntarily, knowingly, and intelligently waived those rights, and agreed to speak with the detectives. Having reviewed the video recording of the

interrogation, the trial court also found that B.W.'s will was not overborne nor were any of his statements "coerced as a result of improper interrogation tactics." The trial court also rejected B.W.'s arguments that his ability to give a voluntary, knowing, and intelligent waiver was affected by his Asperger's Syndrome, anxiety, PTSD, or limited intellectual capacities. In that regard, the trial court expressly rejected the testimony of Dr. Richardson.

In finding that B.W.'s statement was admissible, the trial court identified eight factors, including that B.W. was twenty-six years old,[5] a college graduate, and was questioned for approximately an hour. The court went on to find that the detectives' questioning was not unduly repetitive and B.W. was never threatened.

All the trial court's factual findings are supported by substantial credible evidence in the record and we discern no basis for rejecting them. Moreover, the trial court correctly summarized the governing law and applied that law to the facts.

B.W. relies on our Supreme Court's opinion in L.H. and argues that his statement should be suppressed just as the statement in L.H. was suppressed.

---

[5] B.W. was twenty-five when he was interviewed but twenty-six when the trial court made its decision.

We disagree because the facts in L.H. are distinguishable. In L.H., the defendant was interrogated for approximately three hours and the detectives who interrogated him falsely promised counseling "as a substitute for jail," and told the defendant that "the truth would set him free." 239 N.J. at 52. Here, by contrast, the detectives made no false promises for counseling and the questioning was not as prolonged or coercive in nature.

In short, the trial court considered the totality of the circumstances and its factual findings are supported by the evidence in the record. Thus, we discern no grounds for reversing the court's decision to deny the motion to suppress B.W.'s statement. We note in that regard, that B.W. was tried as a juvenile, thus it was the trial judge who made the ultimate factual findings and considered the weight to be accorded to the statements made by B.W. when he was questioned by the detectives.

2.      The Allegations of Sexual Assault Against the Father of the Victims

Prior to trial, counsel for B.W. apparently informed the State that B.W. would seek to offer evidence that Lucy's father had sexually assaulted her when she was approximately three years old. B.W. apparently intended to argue that the father's alleged prior sexual assault of Lucy undercut the credibility of Lynne's and Lucy's testimony that B.W. sexually assaulted them. The State

15

objected to that evidence and the court conducted an evidentiary hearing under Rule 104.

After hearing testimony concerning the alleged assault by the father, the trial court ruled that the evidence was unreliable and, therefore, could not be admitted under evidence Rules 403, 404(b), and 608(b). Having reviewed the record, we agree with the trial judge that the allegations concerning the sexual assault by the father were unreliable and were properly excluded under Rule 403.

We review a trial court's ruling "on the admissibility of evidence" for abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). Rule 403 provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."

Here, the trial court determined that the allegations against the father could confuse the issues by suggesting that Lucy was unsure of who sexually assaulted her. We discern no basis to disturb that decision. The evidence at the Rule 104 hearing established that the allegations against the father were made in 2003, and while the mother had initially suggested that the father might have

sexually abused Lucy, she thereafter retracted that statement. There was an investigation, but no substantiation and no criminal charges.

3.    The Sufficiency of the Evidence

B.W. argues that the testimony of Lynne and Lucy gave rise to reasonable doubt and the trial court erred in finding that he had sexually assaulted his cousins and had endangered their welfare. In making that argument, B.W. focuses on the sleeping arrangements and contends that it is incredible to believe that he could have assaulted each of the victims on hundreds of occasions without the grandmother noticing. He also argues that the victims' credibility was undercut by their delayed reporting of the assaults and implies they had a motive to lie because the grandmother had asked the family to leave her home in 2015.

After hearing all the evidence, the trial judge made detailed factual and credibility findings. He found that the testimony by Lynne and Lucy was credible and consistent. He noted the sleeping arrangements, but relied on the consistent testimony by Lynne and Lucy concerning how B.W. would crawl into the room at night and assault them.

The trial judge expressly found B.W.'s testimony incredible. Similarly, the trial judge found the testimony of the grandmother and aunt to be incredible.

He rejected the notion that Lynne and Lucy had a motive to lie because the grandmother had asked the family to move out of her home in 2015.

Our review of a juvenile delinquency adjudication is limited. State ex rel. D.M., 238 N.J. 2, 15 (2019) (citing State ex rel. J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004)). We will accept the trial judge's factual findings if they are supported by substantial credible evidence in the record. Ibid. Moreover, we accept the trial judge's credibility findings, recognizing that the judge is in a better position to assess the credibility of witnesses who have appeared before the judge. See State v. J.R., 227 N.J. 393, 410 (2017) (citation omitted); State ex rel. D.M., 451 N.J. Super. 415, 424 (App. Div. 2017) (citations omitted), aff'd on other grounds, 238 N.J. 2 (2019).

The arguments presented by B.W. on this appeal do not go to the sufficiency of the evidence; but rather, they challenge the weight of the evidence. Those are issues properly considered by the fact finder. The trial judge here considered, but rejected, B.W.'s arguments and we discern no grounds for reversing the trial judge.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3782-18T4